**UNITED STATES OF AMERICA, Plaintiff**
**v.**
**DAVID ANTHONY SUPERVILLE, Defendant**

Crim. No. 1998-112

District Court of the Virgin Islands

Div. of St. Thomas and St. John

March 18, 1999

Sᴀʀᴀʜ L. Wᴇʏʟᴇʀ, Esǫ., St. Thomas, U.S.V.I., *for plaintiff*

Pᴀᴍᴇʟᴀ L. Wᴏᴏᴅ, Esǫ., St. Thomas, U.S.V.I., *for defendant*

MOORE, *Chief Judge*

## MEMORANDUM

On November 19, 1998, a grand jury indicted defendant David Anthony Superville ["Superville"] for falsely representing that he possessed a Social Security number not assigned to him, in violation of 42 U.S.C. § 408(a)(7)(b)). Superville has moved to suppress statements taken from him by the Immigration and Naturalization Service ["INS"] as well as his file with the Workmen's Compensation Division ["WCD"] of the Virgin Islands Department of Labor. The Court took evidence on these matters several months ago.

## I. FACTS

On April 8, 1998, Superville, a citizen of Trinidad and Tobago, visited the INS office in St. Thomas and informed INS Special Agent Kirk Thomas ["Thomas"] that he wished to return home for medical treatment because he had injured his leg. He lacked travel documents, so Thomas told him to return to his office the next day with an airline ticket and written verification of the injury. Thomas testified that he requested these documents to process the defendant's voluntary departure from the United States.

Superville returned to the INS office on April 9th and gave Thomas numerous papers verifying his injury. Thomas noticed that one of the documents referred to workers' compensation and recited a Social Security number. He told the defendant that he

could not leave the United States that day, and instructed him to return to the INS office on April 14, the Tuesday following the Virgin Islands' Easter holiday. Thomas testified that he planned to speak with WCD personnel in order to confirm whether Superville had falsely represented that he possessed the Social Security number that appeared on his medical documents.

Later on the 9th, other INS officers intercepted Superville at the St. Thomas airport as he attempted to board a flight with a ticket, but no passport. Senior Immigration Inspector John Robertson detained the defendant and informed him of his *Miranda* rights by reading the "Warning As To Rights" section of INS Form I-214. Immigration Inspector Allison Haywood then read INS Form I-867A to Superville and questioned him. During the interview, the defendant admitted that he had unlawfully entered the United States and had worked for several years in St. Thomas. After the interview ended, the agents confiscated Superville's belongings and discovered that he possessed an identification card that bore a Social Security number. The defendant was arrested immediately and the United States Attorney filed an information charging him with the crime of unlawful entry.

INS brought Superville to court, but never presented him to a judicial officer because an Assistant United States Attorney declined to prosecute the defendant and later moved to dismiss the information. Instead, the agency sent Superville to the St. Thomas jail. The magistrate judge dismissed the unlawful entry charge on April 15th.

Coincidentally on April 15th, Workmen's Compensation personal informed Agent Thomas that Superville had filed a workers' compensation claim and received benefits. WCD personnel disclosed this information from the defendant's file, but did not allow Thomas to personally review the file because he had not subpoenaed the agency's records. Later that day, the Social Security Administration ["SSA"] advised Thomas that it had not assigned Superville the Social Security number appearing on the medical documents that the defendant had left with him. By this time, the

government had granted approval to prosecute Superville for Social Security fraud.[1]

Superville's next contact with INS occurred on April 17th, when Agent Thomas retrieved him from the St. Thomas jail to interrogate him. Thomas testified that he informed the defendant of his right to the assistance of counsel by reading the "Warning As To Rights" section of INS Form I-214 before questioning him. Superville admitted during the interview that he had obtained a Social Security number from his employer in St. Thomas. For the next five days, Thomas tried to locate and question the defendant's former employer without success. The government filed a complaint on April 22nd that charged the defendant with falsely representing that he possessed a Social Security number not assigned to him, in violation of 42 U.S.C. § 408(a)(7)(b).

Superville finally appeared before the magistrate judge for an advice of rights on April 23, 1998. Although the defendant had spent fourteen days in the squalid St. Thomas jail, this was the first time INS had presented him to a judicial officer. After the magistrate judge authorized INS to detain Superville pending trial, the government moved the defendant to a federal facility. Superville then moved to suppress his two statements.

## II. DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Superville seeks to have this Court suppress his April 9th and April 17th statements because INS failed to honor his rights under the Vienna Convention on Consular Relations by not allowing him to contact the consulate of Trinidad and Tobago, and violated Federal Rule of Criminal Procedure 5(a) by not presenting him to the magistrate judge "without unnecessary delay." Superville also asks the Court to suppress his first statement because INS administered misleading warnings to him on April 9th. The Court will address each contention in turn.

---

[1] See Suppression Hr'g, Def.'s Ex. H ("On Wednesday, April 15[th], I learned that the United States Attorney's office granted approval to prosecute Mr. Superville for fraud.") (statement of Senior Immigration Inspector John Robertson)).

## A. Defendant's Rights under Vienna Convention

Superville complains that INS violated his rights under the Vienna Convention on Consular Relations ["Vienna Convention"] by not allowing him to contact the consulate of Trinidad and Tobago upon his arrest. The United States and Trinidad and Tobago have signed the Vienna Convention, which grants a foreign national like Superville the right to contact his consul immediately upon such detention:

> If [the detained alien] so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this subparagraph.

Vienna Convention, Apr. 24, 1963, art. 36, ¶ 1(b), 21 U.S.T. 77, 596 U.N.T.S. 261. Before reaching the merits of Superville's claim, the Court must resolve the threshold question of whether the defendant has legal standing to raise this issue.

### 1. Standing

The question arises because treaties are agreements between sovereign nations and violations of these agreements traditionally have been resolved by government officials, not the individual citizens impacted by treaty violations. Under the fundamental principle of *pacta sunt servanda*, which states that "treaties must be observed,"[2] the United States has consistently invoked the Vienna Convention to protest other nations' failures to provide Americans

---

[2] The principle of *pacta sunt servanda* "is considered to be a jus cogens norm, a fundamental standard of conduct that cannot be set aside by treaty or acquiescence." William J. Aceves, *The Vienna Convention on Consular Relations: A Study of Rights, Wrongs, and Remedies*, 31 VAND. J. TRANSNAT'L L. 257, 293 (1998).

with access to consular officials.[3] This basic principle also requires, of course, that the United States respect its obligations under the treaty. Reciprocity is the foundation of international law. *See Breard v. Pruett*, 134 F.3d 615, 622 (4th Cir. 1998) (Butzner, J., concurring) (citing *Hilton v. Guyot*, 159 U.S. 113, 228, 40 L. Ed. 95, 16 S. Ct. 139 (1895)). Accordingly, the State Department has intervened and attempted to persuade state authorities to honor the Vienna Convention when state law enforcement officers have neglected or refused to inform detained foreign nationals of their right to contact consular officials. For example, the Secretary of State recently asked the Governor of Virginia to stay the execution of Paraguayan death-row prisoner Angel Francisco Breard until the International Court of Justice could consider whether Virginia's violation of the Vienna Convention warranted a new trial. The Secretary expressed concern that "the execution . . . could lead some countries to contend incorrectly that the U.S. does not take seriously its obligations under the Convention."[4] As the Secretary recognized, continued violation of the treaty imperils the rule of law, the stability of consular relations, and the safety of Americans detained abroad.

---

[3] Most memorably, in 1979, it condemned the Islamic Republic of Iran for preventing U.S. diplomats from communicating with American hostages, in violation of the Vienna Convention. *See* Aceves, *supra* note 2, at 271 (noting that the International Court of Justice later ruled that Iran violated the Vienna Convention). In 1986, the United States explicitly relied on the treaty to visit an American imprisoned in Nicaragua. *See* Andrew Selsky, *Ortega: American Prisoner will be Tried*, AP, Oct. 11, 1986, available at 1986 WL 3073140.

[4] *See* Associated Press, *A Plea to Spare Killer*, NEWSDAY, Apr. 15, 1998, at A24 (quoting letter from Secretary Albright). The State Department periodically issues notices to state and local law enforcement authorities informing them that "compliance with the notification requirement is essential to ensure that similar notice is given to U.S. diplomatic and consular officers when U.S. citizens are arrested or detained abroad." *See* Dep't of State, Notice for Law Enforcement Officials on Detention of Foreign Nationals (1993). Since the individual states have their own sovereignty, however, they have not always acquiesced to the entreaties of the State Department. In the past two years, the United States government issued formal apologies to Mexico and Paraguay after citizens of those countries who were not informed of their right to contact consuls upon arrest were executed for state murder convictions. *See* Phillipe Sands, *An Execution Heard 'Round the World*, L.A. TIMES, Apr. 16, 1998, at B9 (discussing Virginia execution of Paraguayan Angel Francisco Breard); New York Times News Service, *Agencies Reminded About Foreigners' Rights Upon Arrest*, DALLAS MORNING NEWS, Nov. 30, 1997, at 16A (reporting dispute over Texas execution of Mexican Irineo Tristan Montoya).

Angel Francisco Breard sought a new trial after his murder conviction because Virginia police had not advised him upon arrest of his right to contact the Paraguayan consul. Breard eventually asked the Supreme Court to determine whether he had legal standing to raise a Vienna Convention violation as grounds for relief in federal court. *See Breard v. Greene,* 523 U.S. 371, 118 S. Ct. 1352, 140 L. Ed. 2d 529 (1998). Although the Supreme Court held that Breard defaulted on his habeas petition because he failed to raise the treaty violation in state court, it did not question whether Breard had standing to raise the issue in the first place. It observed that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest," and weighted in dicta whether Breard was entitled to relief. See 523 U.S. at —, 118 S. Ct. at 1355.

Without expressly deciding the standing question, most courts facing the issue have conceded that detained aliens may raise claims under the Vienna Convention. *See United States v. Esparza-Ponce,* 7 F. Supp. 2d 1084, 1096 (S.D. Cal. 1998) (reaching merits of Vienna Convention claim after noting that "several courts have allowed individual claims of violations of the Convention to proceed"); *Villafuerte v. Stewart,* 142 F.3d 1124, 1125-26 (9th Cir. 1998) (ruling, without discussion of standing issue, that habeas corpus petitioner defaulted on his treaty violation claim); *Breard v. Netherland,* 949 F. Supp. 1255, 1263 (E.D. Va. 1996), *aff'd,* 134 F.3d 615, 619-20 (4th Cir. 1997) (same); *Faulder v. Johnson,* 81 F.3d 515, 520 (5th Cir. 1996) (reaching merits and acknowledging that Canadian detainee had not "been advised of his rights under the Convention") (emphasis added).[5]

As these Courts have recognized, Article 36 of the Vienna Convention does more than regulate consular relations. Although the treaty generally facilitates "the exercise of consular functions,"

---

[5] *But see Republic of Paraguay v. Allen,* 949 F. Supp. 1269 (E.D. Va. 1996) (stating in dicta that the Vienna Convention is not "self-executing," or enforceable by individuals, because it confers no "rights of action on private individuals."). Contrary to *Allen,* however, detained aliens have the right to impel receiving states to contact their consuls under the Vienna Convention. Under the centuries-old precept that 'where there is a legal right, there is also a legal remedy by suit or action at law whenever that right is invaded," Sir William Blackstone, 3 COMMENTARIES ON THE LAWS OF ENGLAND 23, cited in *Marbury v. Madison,* 5 U.S. 137, 163, 2 L. Ed. 60 (1803), the Vienna Convention is a "self-executing" treaty, enforceable by detained aliens.

463

see Vienna Convention, art. 36, and was not specifically designed "to benefit individuals," *see id.* preamble, the text of article 36 enshrines a personal right to consular access by mandating that "receiving States" must contact an alien detainee's consulate "if he so requests." *See id.* art. 36, ¶ 1(b); *see also, e.g., United States v. Enger,* 472 F. Supp. 490, 506 n.18 (D.N.J. 1978) (observing that article 36 does not affect "the various privileges and immunities accorded representatives of foreign governments"). Article 36's language "indicates that the drafters intended to create rights for individuals." *Esparza-Ponce,* 7 F. Supp. 2d at 1095 (citing Mark J. Kadish, *Article 36 of the Vienna Convention on Consular Relations: A Search for the Right to Consul,* 18 Mich. J. Int'l L. 565, 594-602 (1997) (summarizing Convention history and recognizing that drafters intended to enact individual right to consular access)).

Federal agencies arresting a foreign national such as Superville are obliged to observe Vienna Convention article 36 under the Supremacy Clause of the United States Constitution, which declares that "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2 (emphasis added); *see also Whitney v. Robertson,* 124 U.S. 190, 194, 8 S. Ct. 456, 31 L. Ed. 386 (1888) ("By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation.").

In recognition of the Supremacy Clause, and the expressed intent of the Vienna Convention,[6] the Justice Department and INS require their agents to advise alien detainees of their right to contact consular officials. INS instructs its agents that "every detained alien shall be notified that he or she may communicate with the consular or diplomatic officers of the country of his or her nationality in the United States." *See* 8 C.F.R. § 236.1(e) (formerly codified at 8 C.F.R. § 242.2(g));[7] *see also United States v. Calderon-Medina,* 591 F.2d 529, 532 (9th Cir. 1979) (observing that INS regulation "was evidently intended to ensure compliance with the

---

[6] *See* Vienna Convention, Apr. 24, 1963, art. 36, ¶ 1(b), 21 U.S.T. 77, 596 U.N.T.S. 261 ("The said authorities shall inform the person concerned without delay of his rights under this subparagraph.").

[7] The Department of Justice's general regulation, entitled "Notification of Consular Officers Upon the Arrest of Foreign Nationals," appears at 28 C.F.R. § 50.5.

Vienna Convention"); Kadish, *supra*, at 599-601. The government thus acknowledges that the right to consular access is meaningless unless the "receiving state" (in this case, the United States) informs detained aliens of their right to consular access under the treaty. *Cf. Miranda v. Arizona*, 384 U.S. 436, 467-68, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966) (recognizing warning as "threshold requirement for the intelligent exercise" of constitutional right to legal representation).

■ The text of the Vienna Convention, the recorded intentions of its drafters, and the prevailing view among federal agencies and courts lead this Court to conclude that, as a detained alien, Superville has standing to seek relief for INS' alleged violation of Vienna Convention article 36, paragraph 1(b). The Vienna Convention confers on Superville the personal right to contact his consul, which gives him standing to complain that INS violated his rights under the treaty. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442, 102 L. Ed. 2d 818, 109 S. Ct. 683 (1989).[8]

### 2. Prejudice

The language of the Vienna Convention does not require detained aliens to demonstrate prejudice in order to gain relief for the receiving nation's failure to notify them of their right to consular access. Nevertheless, the few federal courts that have considered this subject have required claimants to show prejudice from violations of the treaty. One justification for this added requirement is that the right to consular access does not "trace[ ] its origins to concepts of due process." *See Waldron v. INS*, 17 F.3d 511, 518 (2d Cir. 1994) (construing INS' consular notification requirement), *cited in Esparza-Ponce*, 7 F. Supp. 2d at 1097 (concluding that defendant's Vienna Convention claim was not entitled to Miranda presumption of prejudice). Other courts simply have required claimants to show prejudice from Vienna Convention violations without any discussion. *See Breard*, 118 S. Ct. at 1355 (nothing in dicta that petitioner would have to establish "that the violation of

---

[8]Superville would also have standing under 8 C.F.R. § 236.1(e) because he alleges that INS failed to notify him of his right to contact consular officials. *See Waldron v. INS*, 17 F.3d 511, 518 (2d Cir. 1994); *United States v. Rangel-Gonzales*, 617 F.2d 529, 530 (9th Cir. 1980); *Calderon-Medina*, 591 F.2d at 532.

his Vienna Convention rights prejudiced him"); *Faulder*, 81 F.3d at 520 (concluding that treaty "violation . . . does not merit reversal" because petitioner failed to demonstrate prejudice).

■ In Superville's case, the Court need not resolve whether it must presume prejudice from a Vienna Convention violation because it appears that INS did notify the defendant of his right to consular access. At the suppression hearing, Superville's counsel asked Inspector Robertson whether he advised the defendant of his right to consular access upon detaining him. Robertson responded, "yes, we did give him that opportunity." (See Tr. at 114.) Since no evidence in the record contradicts Robertson's statement, the Court cannot find that INS violated the defendant's Vienna Convention right to contact his consul.

## B. Unnecessary Delay in Presentation to Magistrate Judge

Superville next contends that the inculpatory statements[9] obtained from him on April 9th and 17th should be excluded from evidence under Federal Rule of Criminal Procedure 5(a),[10] which states that "any person making an arrest . . . shall take the arrested person without unnecessary delay before the nearest available federal magistrate judge." *See* Fed. R. Crim. P. 5(a). Although INS arrested the defendant on April 9th, it did not present him to a magistrate judge for an advice of rights and appointment of an attorney until April 23rd, fourteen days later. Since Rule 5(a) does not define "unnecessary delay," the Court will review INS' conduct by applying the pertinent Supreme Court caselaw and Congress' statutory response.

---

[9] As defined in Title 18, section 3501 of the United States Code, "the term 'confession' means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing." 18 U.S.C. § 3501(e). For the purpose of resolving the issues raised by Superville, the Court will describe his statements to INS as confessions because each contained potentially culpable admissions.

[10] *The Federal Rules of Criminal Procedure apply to all criminal proceedings in the District Court of the Virgin Islands. See* Fed. R. Crim. P. 54(a).

## 1. *The McNabb-Mallory Rule*

The right to presentation[11] before a neutral judicial officer "without unnecessary delay" codified in Rule 5(a) advances at least three vital interests. It "protect[s] the citizen from a deprivation of liberty as a result of an unlawful arrest by requiring that the Government establish probable cause," "effectuate[s] and implement[s] the citizen's constitutional rights by insuring that a person arrested is informed by a judicial officer" of those rights, and "minimize[s] the temptation and opportunity to obtain confessions as a result of coercion, threats, or unlawful inducements." 113 CONG. REC. 36,067 (1967), *cited in United States v. Alvarez-Sanchez*, 975 F.2d 1396, 1398 (9th Cir. 1992), *rev'd on other grounds*, 511 U.S. 350, 128 L. Ed. 2d 319, 114 S. Ct. 1599 (1994). As Mr. Justice Frankfurter declared in *McNabb v. United States*, 318 U.S. 332, 343-44, 87 L. Ed. 819, 63 S. Ct. 608 (1943):

> The purpose of this impressively pervasive requirement of criminal procedure is plain. A democratic society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process. . . . The awful instruments of the criminal law cannot be entrusted to a single functionary. The complicated process of criminal justice is therefore divided into different parts, responsibility for which is separately vested in the various participants upon whom the criminal law relies for its vindication. [Rule 5(a)], requiring that the police must with reasonable promptness show legal cause for detaining arrested persons, constitutes an important safeguard—not only in assuring protection for the innocent but also in securing conviction of the guilty by methods that commend themselves to a

---

[11] Although several opinions refer to the defendant's initial appearance before a judicial officer as an "arraignment," this is an incorrect use of that term. *See* 1 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE (CRIMINAL) § 71, at 115 (3d ed. 1999) ("The settled meaning of 'arraign' is 'the initial step in a criminal prosecution whereby the defendant is brought before the court to hear the charges and enter a plea.' That procedure is covered by Rule 10 . . . ."). This opinion uses the term "presentation" to describe the defendant's initial appearance before a judicial officer who may advise him of his rights, set bail, and arrange for the appointment of counsel if he cannot afford one.

progressive and self-confident society. . . . It aims to avoid all the evil implications of secret interrogation of persons accused of crime. It reflects not a sentimental but a sturdy view of law enforcement.

Beginning with *McNabb* and ending with *Mallory v. United States,* 354 U.S. 449, 1 L. Ed. 2d 1479, 77 S. Ct. 1356 (1957), the Supreme Court fashioned an exclusionary rule (frequently termed the "McNabb-Mallory rule") that rendered inadmissible in federal cases any confession obtained from a detained arrestee who was not brought before a judicial officer "without unnecessary delay." As a corollary, the Court ruled that a desire of federal agents to interrogate the accused was not a reasonable basis for delaying presentation to the magistrate judge. Rule 5(a) did not contemplate such delay as "necessary." *See, e.g., Upshaw v. United States,* 335 U.S. 410, 414, 93 L. Ed. 100, 69 S. Ct. 170 (1948).

## 2. Section 3501: Congress Modifies the McNabb-Mallory Rule

Eleven years after *Mallory,* Congress attempted to modify the Supreme Court's exclusionary rules governing the admissibility of confessions in federal prosecutions[12] by enacting 18 U.S.C. § 3501 in the Omnibus Crime Control and Safe Streets Act of 1968. Pub. L. No. 90-351, 82 Stat. 210 [hereinafter "Omnibus Crime Act"]. Section 3501(a) declares that voluntary confessions generally are admissible,[13] and section 3501(b) codifies the "totality of the

---

[12] *See infra,* 1999 U.S. Dist. LEXIS 3726, 26-31 (describing Congressional intent in enacting subsections (a) and (c) of 18 U.S.C. § 3501). In *United States v. Dickerson,* 166 F.3d 667 (4th Cir. 1999), the Fourth Circuit Court of Appeals ruled that Congress successfully overrode the Supreme Court's decision in *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), by enacting the Omnibus Crime Act. See id. at 694. The question Superville presents was not before the *Dickerson* panel and the issue raised in Dickerson is not before the Court.

[13] *See* 18 U.S.C. § 3501(a) (emphasis added):

In any criminal prosecution brought by the United States or by the District of Columbia, a confession . . . shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

circumstances" test for voluntariness.[14] Section 3501(c) provides that confessions made within six hours of arrest or detention shall not be inadmissible solely for delay in presenting the defendant to a judicial officer.[15]

Superville contends that statements taken by federal agents more than six hours after arrest are subject to suppression under the *McNabb-Mallory* rule. The government counters that the sole test under 18 U.S.C. § 3501 for admission of any defendant's post-arrest statements is whether the defendant voluntarily confessed, and delay in presentation is only one factor in this determination. Since "it is axiomatic that statutory interpretation properly begins with the language of the statute itself, including all of its parts," see *Sacred Heart Medical Center v. Sullivan*, 958 F.2d 537, 545 (3d Cir. 1992) (citation omitted), the Court first turns to the text of section 3501.

---

[14] *See id.* § 3501(b) (emphasis added):

> The trial judge in determining the issue of voluntariness *shall take into consideration all the circumstances surrounding the giving of the confession*, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.
>
> The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

[15] *See id.* § 3501(c):

> In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate . . . if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is to be left to the jury and if such confession was made or given within six hours immediately following his arrest or other detention: Provided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate . . . beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

469

Section 3501(a) declares that "a confession . . . shall be admissible in evidence if it is voluntarily given." 18 U.S.C. § 3501(a) (emphasis added). Section 3501(b) goes on to list "the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment" as one factor in the voluntariness inquiry. *Id.* § 3501(b). Section 3501(c), on the other hand, mentions delay as an admissibility factor even for voluntary confessions. It states that voluntary confessions made during the first six hours of a defendant's "arrest or other detention . . . shall not be inadmissible solely because of delay in bringing such person before a magistrate." *See id.* § 3501(c) (emphasis added). Section 3501(c) thus implies that some voluntary statements may be inadmissible, despite subsection (a)'s statement that voluntary confessions "shall be admitted in evidence."

If every voluntary confession were admissible, as section 3501(a) read alone appears to require, there would be no need for section 3501(c) to provide that voluntary statements obtained in the first six hours following arrest or detention cannot be suppressed for pre-presentation delay. Subsection (c) would be entirely superfluous. *Accord Alvarez-Sanchez*, 975 F.2d at 1400; *United States v. Perez*, 733 F.2d 1026, 1031 (2d Cir. 1984); *United States v. Wilbon*, 911 F. Supp. 1420, 1426-27 (D. N. Mex. 1995). The Court cannot nullify subsection (c), even if it were so inclined. *See Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 250, 86 L. Ed. 2d 168, 105 S. Ct. 2587 (1985) (refusing to interpret statute in manner that would render one of its provisions inoperative). Congress must have intended section 3501(c) to play some role in the admissibility of confessions.

Subsection (c) opens with introductory language similar to that in subsection (a), but unlike the preceding subsections, it does not help define voluntariness. Indeed, it does not provide that a confession made during the safe harbor cannot be deemed involuntary solely because of delay; it states that a confession cannot be ruled "inadmissible solely because of delay." *Id.* § 3501(c) (emphasis added). "In view of the fact that Congress coupled the word 'inadmissible' with 'delay,' the meaning of subsection (c) must be that delay may serve as the basis for a separate, independent

470

exclusionary remedy." *Perez*, 733 F.2d at 1031. Section 3501 seems to address two different aspects of the admissibility of confessions.

The most sensible reading of section 3501 is that subsection (c) operates independently of subsection (a) and exempts certain voluntary confessions from the *McNabb-Mallory* exclusionary rule. Otherwise, Rule 5(a)'s requirement that arrestees appear before committing magistrates "without unnecessary delay" would become "a rule without a remedy." *Wilbon*, 911 F. Supp. at 1429; *see Perez*, 733 F.2d at 1031.

The legislative history of the Omnibus Crime Act confirms that subsections (a) and (c) address two separate exclusionary rules fashioned by the Supreme Court in the twenty-five years preceding the 1968 Omnibus Crime Act. Subsection (a) "was enacted in light of congressional concern over the Supreme Court's holding in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), that confessions should be suppressed in certain circumstances without finding the defendants' statements to have been involuntary in traditional terms." *Alvarez-Sanchez*, 975 F.2d at 1402 (citing S. REP. No. 1097, reprinted in 1968 U.S.C.C.A.N. 2112) (citations and quotation marks omitted). On the other hand, subsection (c) originally was intended "to repeal the decision of the Supreme Court in *Mallory v. United States*, 354 U.S. 449, 1 L. Ed. 2d 1479, 77 S. Ct. 1356 (1957)." S. REP. No. 1097, 90th Cong., reprinted in 1968 U.S.C.C.A.N. 2112; *see Government of the Virgin Islands v. Gereau*, 502 F.2d 914, 923 (3d Cir. 1974) (acknowledging that subsection (c) "alter[s] interpretation of Rule 5(a)'s direction that an arrested person be taken before a magistrate 'without unnecessary delay.'").

The legislative history also confirms that Congress only excluded confessions made less than six hours after arrest or detention from the application of the *McNabb-Mallory* rule. As originally drafted by the Senate Judiciary Committee, section 3501(c) would have made voluntariness the only criterion for admission of pre-presentation confessions. The original subsection (c)[16] did not

---

[16] Section 3501(c) originally provided:

> In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such

contain a six-hour "safe harbor" because its proponents sought to eliminate "the harmful effects of the *Mallory* case" and to "assure that confessions made while the suspect [was] under arrest [would] not be inadmissible solely because of delay in bringing the defendant before a magistrate." S. REP. No. 1097, 90th Cong., reprinted in 1968 U.S.C.C.A.N. 2112.

Proposed subsection (c) drew substantial criticism in the Judiciary Committee. Senators feared that it would "encourage prolonged and indefinite incarceration and interrogation of suspects, without opportunity to consult with friends, family, or counsel."[17] They complained that the subsection failed to set a time limit for pre-presentation interrogation like the three-hour limit that Congress had recently set in the District of Columbia Crime Act. This original version of 3501(c) only passed in committee by an evenly divided vote. *See id.*

When the Omnibus Crime Act reached the Senate floor, Senator Hugh Doggett Scott, Jr. of Pennsylvania added the language that removed confessions given less than six hours after arrest or detention from the *McNabb-Mallory* exclusionary rule. *See* 114 CONG. REC. 14,184-86 (1968), *cited in Wilbon*, 911 F. Supp. at 1430. Like many of his colleagues, Senator Scott grew concerned that proposed subsection (c) might permit unlimited police interrogation or eliminate the right to a speedy presentation. Congress adopted Senator Scott's absolute six-hour limitation on pre-presentation delay without a roll-call vote. Two days later, the Senate added reasonable delay in transporting the detained person to the magistrate judge to the six-hour exemption from the *McNabb-Mallory* rule. *See* 114 CONG. REC., 14,787, *cited in Wilbon*, 911 F. Supp. at 1430. When the Senate approved the Omnibus Crime Act by an overwhelming majority on May 24, 1968, and the House passed it

---

person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a commissioner or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury.

S. 917, 90th Cong. § 701 (1968).

[17] *See* S. REP. No. 1097, 90th Cong., reprinted in 1968 U.S.C.C.A.N. 2112 (Minority Views of Messrs. Tydings, Dodd, Hart, Long (Mo.), Kennedy (Mass.), Burdick, and Fong).

on June 6, 1968, it contained section 3501 as it essentially appears today. *See Perez,* 733 F.2d at 1033; *Wilbon,* 911 F. Supp. at 1430. Thus, as the language of section 3501 and its legislative history both demonstrate, Congress flatly refused to "overrule" *McNabb* or *Mallory.*

This Court accordingly holds that 18 U.S.C. § 3501(c) only excised the first six hours after arrest or detention from the scope of the *McNabb-Mallory* exclusionary rule. Federal agents may delay presenting a detained defendant to a judicial officer and obtain a statement from him or her during the first six hours after arrest or detention without running afoul of Rule 5(a). In other words, the first six hours of federal custody or detention, plus reasonable delay in travel to the presentation, can never constitute the "unnecessary delay" proscribed by Federal Rules of Criminal Procedure 5(a). The *McNabb-Mallory* exclusionary rule remains fully applicable to confessions taken outside this period. Before applying this holding to Superville's statements, however, the Court must resolve whether section 3501 applies to the facts of this case.

### 3. Section 3501 Applies to the Defendant's Statements

The government argues that the Court cannot analyze Superville's statements under 18 U.S.C. § 3501 because the statute does not apply to statements elicited during INS administrative detention. The Court rejects this sweeping claim because section 3501 expressly applies to any federal detention, and Superville remained in criminal custody from the moment that INS detained him on April 9, 1998.

Statements elicited during administrative detention are subject to the voluntariness inquiry under section 3501(b) because the statute does not discriminate between civil and criminal confinement. Section 3501(b) lists five principal factors that courts should consider in assessing whether a defendant voluntarily confessed, and none focus on the authority under which the defendant was detained.[18] Whether civil or criminal, the legal authority for a defendant's confinement has almost no bearing on the voluntariness of a confession.

---

[18] The text of subsection (b) appears at note 14, supra.

Section 3501 is replete with references to detention other than criminal arrest, which includes INS administrative custody. Section 3501(c) applies to confessions "made or given within six hours immediately following . . . arrest or other detention" by a federal law enforcement agency. *See* 18 U.S.C. § 3501(c) (emphasis added). Section 3501(d) states that 'nothing contained in this [statute] shall bar the admission in evidence of any confession made . . . at any time at which the person who made or gave the confession was not under arrest or other detention." *Id.* § 3501(d) (emphasis added). "In short, it is evident from the context in which the phrase is used that the 'arrest or other detention' of which the subsection speaks must be an 'arrest or other detention' for a violation of federal law." *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358, 128 L. Ed. 2d 319, 114 S. Ct. 1599 (1994) (citation and quotation marks omitted).

Since INS detained Superville for violating federal immigration and Social Security laws, his statements fall within the ambit of section 3501(c). The government's assertion that INS held Superville solely in administrative detention is a gross distortion of how the agency actually treated the defendant. Although "there can be no 'delay' in bringing a person before a federal magistrate until, at a minimum, there is some obligation to bring the person before such a judicial officer in the first place," see *Alvarez-Sanchez*, 511 U.S. at 358, Superville's April 9th arrest for illegal entry immediately triggered the Rule 5(a) requirement that INS promptly bring him before the magistrate judge "without unnecessary delay" to be advised of the charge and of this constitutional rights, including the right to have counsel appointed to represent him. The basis for Superville's detention did not magically morph from criminal arrest to civil detention when an assistant United States attorney decided to dismiss the information. Superville languished in the St. Thomas jail under criminal process through April 15th. The fact that INS simultaneously may have had an administrative detainer on Superville pending deportation (now called 'removal") proceedings does not withdraw his in-custody confessions from scrutiny under 18 U.S.C. § 3501.

Even after the magistrate judge dismissed the unlawful entry charge against Superville on April 15th, INS continued to engage in

the federal stalling tactics targeted by Rule 5(a) and *McNabb-Mallory*. A brief comparison of INS' behavior in this case to the federal agents' conduct in Alvarez-Sanchez is illustrative. In that case, California officers found evidence that Pedro Alvarez-Sanchez had committed a federal crime. The state officers took him into custody on a Friday afternoon. Once the weekend was over, the state officers notified the United States Secret Service of their discovery. Alvarez-Sanchez soon confessed to the federal crime, and the federal agents promptly arrested him. The Secret Service brought him before a magistrate judge within twenty-four hours. *See Alvarez-Sanchez*, 511 U.S. at 352.

Superville, on the other hand, twice faced federal charges during April, 1998. Agent Thomas was investigating the defendant for violation of federal Social Security law even before his unlawful entry arrest, and the agents that detained Superville discovered that he possessed an identification card that bore a Social Security number. By April 15th, Thomas had confirmed that Superville had obtained workers' compensation proceeds with a false Social Security number. Thomas even possessed documentary proof of the offense from the medical documents obtained from the defendant. Further, the government had granted approval to prosecute Superville for Social Security fraud by that date. Nevertheless, INS kept Superville in the notorious St. Thomas[19] even after the magistrate judge dismissed the unlawful entry charge. This was not administrative detention; the record does not show that INS planned to conduct removal proceedings. When Thomas finally saw Superville again on April 17th, the defendant had languished in jail for more than a week. This neglect had the effect of inducing

---

[19] INS incarcerated Superville in the St. Thomas jail despite this Court's Order that expressly forbade the agency and other federal instrumentalities from housing their detainees there. See In The Matter Of Federal Detainees Housed or Lodged In Facilities of the Virgin Islands Bureau of Corrections, Misc. No. 97-15 (D.V.I. filed April 4, 1997) ("No persons detained under process of the United States Government and any of its agencies, including, but not limited to, individuals detained as a result of immigration or other administrative processes, shall be lodged or housed in any [Bureau of Corrections] facility in the Virgin Islands."); *see also In The Matter Of Federal Detainees Housed or Lodged In Facilities of the Virgin Islands Bureau of Corrections on St. Croix*, Misc. No. 97-14 (D.V.I. filed April 28, 1997) (permitting United States Marshal to lodge federal detainees in St. Croix prison facilities and emphasizing that "this modification does not authorize the temporary lodging of any federal detainee in any [Bureau of Corrections] facility on St. Thomas.").

the defendant to confess to Social Security fraud. After "sweating" another inculpatory statement from Superville, INS still left him in the squalid St. Thomas jail for another six days before formally "arresting" him again on April 22nd.

■ This case reeks of the federal delay that was absent in *Alvarez-Sanchez*. From April 9th onwards, Superville was under constant criminal process, effectively arrested for Social Security fraud and detained for investigative purposes. The fact that the government deliberately postponed arresting Superville until April 22nd cannot preclude this Court from reviewing INS' conduct under section 3501. Where the civil and criminal authority employed to detain a defendant are so inextricably intertwined, the Court must review every fact that bears upon the "unnecessary delay" proscribed by Rule 5(a) and the voluntariness of his confession given during that confinement.

### a. The April 9th Statement Falls Within the "Safe Harbor" and Will Not Be Suppressed

Since INS obtained Superville's first inculpatory statement during the first six hours of his detention, it falls within section 3501(c)'s "safe harbor" from the *McNabb-Mallory* rule because the preponderance of the evidence suggests that it was voluntarily given.[20]

INS interrogated Superville almost immediately after he was detained, since Inspector Haywood recorded his statement shortly after Senior Inspector Robertson stopped him at the St. Thomas airport. Any unnecessary delay in presenting him to the magistrate judge occurred after this interrogation, so it had no effect on his will. Second, although Superville was without counsel during the interview, he admitted that he had entered the United States illegally and had learned from his conversations with Agent Thomas that he was not permitted to leave the country at that time. He thus knew what offense Inspectors Robertson and Haywood were investigating.

---

[20] At trial, the Court will instruct the jury to determine the evidentiary weight of the April 9th statement. *See* 18 U.S.C. § 3501(c).

■ Although the defendant appeared to be in some pain from his injury, he nevertheless agreed to the interview and was comfortably seated. Senior Immigration Inspector John Robertson administered Miranda warnings to Superville by reading the "Warning As To Rights" section of INS Form I-214, and the defendant then read and signed a written waiver of rights. The questioning lasted less than an hour and consisted of thirty-six questions, of which more than a third called for simple "yes or no" answers. Weighing these facts, as well as the [*39] credibility of the witnesses presented at the suppression hearing, the Court concludes that the defendant voluntarily gave his statement to INS on April 9, 1998. That statement will not be suppressed.

### b. The April 17th Statement is Outside the "Safe Harbor" and Will Be Suppressed under the McNabb-Mallory Rule

The Court cannot reach the same conclusion regarding Superville's second inculpatory statement, recorded by Agent Thomas on April 17, 1998. Whether or not the April 17th confession was voluntary, it must be suppressed under the *McNabb-Mallory* exclusionary rule because it was taken some seven days after the agents' six-hour safe haven for such interrogation had expired. INS elicited that confession by ignoring Superville's right to a reasonably prompt appearance before a judicial officer under Federal Rule of Criminal Procedure 5(a). As the Supreme Court first acknowledged in *McNabb*, "a confession resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in wilful disobedience of law." *See* 318 U.S. at 344.

The Supreme Court later expanded on this theme in *Mallory:*

> The duty enjoined upon arresting officers to [bring defendants before magistrate judges] "without unnecessary delay" indicates that this command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay between arrest and [presentation], as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties.

477

354 U.S. at 455. No such circumstances appear in this case. Neither routine processing, nor transportation difficulties, nor urgent medical care, nor an unavailable magistrate judge impeded INS from the swift completion of its Congressionally-mandated duty to present Superville to a magistrate judge "without unnecessary delay." Only Agent Thomas' effort to extract a confession from Superville and his subsequent week-long investigation prolonged the defendant's wait. *McNabb, Mallory,* and their progeny do not countenance such delay.[21]

In *Mallory,* the Supreme Court unanimously reversed the defendant's rape conviction because it was based on a confession that the police procured by delaying his appearance before a judicial officer for seven hours, even though the officers were "within the vicinity of numerous committing magistrates" and already had "ample evidence from other sources . . . for regarding [him] as the chief suspect." *Id.* The court reiterated that any "necessary" delay in presentation "must not be of a nature to give opportunity for the extraction of a confession." *Id.* (emphasis added); *see Upshaw,* 335 U.S. at 412 (agreeing with United States Attorney's statement that delay for interrogation is "inimical to the letter and spirit of the rule requiring prompt arraignment").[22]

■ INS delayed Superville's presentation to a neutral judicial officer in order to extract his confession. Although the agency had not formally arrested him for Social Security fraud, actual arrest

---

[21] *Accord Government of the Virgin Islands v. Solis,* 334 F.2d 517, 520 (3d Cir. 1964) (ruling that, under *McNabb-Mallory* rule, trial judge should have excluded confession obtained from defendant under effective arrest during police department's four-day delay in presenting him to judicial officer).

[22] The Courts of Appeals that have applied the *McNabb-Mallory* rule after the Omnibus Crime Act have uniformly adhered to this view. *See Alvarez-Sanchez,* 975 F.2d at 1405 (suppressing confession obtained during intentional delay in presentation under 24 hours because "such a delay is one of the most patent violations of Rule 5(a)"); *Perez,* 733 F.2d at 1036 (holding that delay in presentation totaling 23 hours was unreasonable because "the AUSA's and DEA agents' desire to investigate other crimes is not a legitimate excuse for their failure to respect Perez' right to a prompt arraignment"); *United States v. Robinson,* 142 U.S. App. D.C. 43, 439 F.2d 553 (D.C. Cir. 1970); *cf. Wilbon,* 911 F. Supp. at 1432 (excluding confession because 38-hour delay in presentation was attributable to FBI agent who "deliberately exploited the delay for the purpose of mustering up sufficient evidence"); *United States v. Erving,* 388 F. Supp. 1011 (W.D. Wis. 1975).

would have imposed no further restriction on his liberty.[23] *See Solis,* 334 F.2d at 520. Superville waited far longer for his presentation than Mallory — nearly fourteen days from his arrest. Yet even after Superville confessed, INS waited an entire week before presenting him to the magistrate judge. These delays were neither "necessary" under Rule 5(a) nor "reasonable" under section 3501(c) or the *McNabb-Mallory* rule. The Court will suppress the defendant's April 17th statement.

### i. Alternative ground for suppression

The Court recognizes that its holding that the "unnecessary delay" proscription of Rule 5(a) and the *McNabb-Mallory* rule both survive section 3501(c) and apply to confessions taken more than six hours after arrest or detention is inconsistent with the Third Circuit Court of Appeals' decision twenty-five years ago in *Government of the Virgin Islands v. Gereau.*[24] After ruling that the trial

---

[23] The Court of Appeals has ruled that INS administrative detention alone does not trigger the *McNabb-Mallory* exclusionary rule when the agency detains an alien to further a criminal investigation. *See Government of the Virgin Islands v. Lovell,* 378 F.2d 799, 804 (3d Cir. 1967). *Lovell* relied on the Supreme Court's decision in *United States v. Carignan,* 13 Alaska 464, 342 U.S. 36, 96 L. Ed. 48, 72 S. Ct. 97 (1951), to conclude that the defendant could not invoke the *McNabb-Mallory* rule because he was lawfully detained at all times. *See id. Lovell* and *Carignan* are inapposite to the facts of this case. Unlike Lovell, Superville was effectively arrested by INS for Social Security fraud and subjected to criminal confinement in an unconstitutional jail. No removal proceedings took place in his case. Furthermore, unlike Carignan, who the police lawfully arrested and presented to a magistrate judge on one charge before interrogating him on mere suspicion that he was involved in another crime, Superville never appeared before a magistrate judge after his first arrest and already was destined for prosecution before his second interrogation. Unlike Lovell or Carignan, Superville suffered all of the detriment that the criminal process could inflict upon him, but received none of the protection that Rule 5(a) affords a criminal detainee.

[24] This Court's ruling is, however, fully in accord with other United States Courts of Appeals that have examined or reconsidered this issue. *See Alvarez-Sanchez,* 975 F.2d at 1405; *Perez,* 733 F.2d at 1035 ("the addition of [revised] subsection (c) on the Senate floor effectively codified a limited *McNabb-Mallory* rule"); *United States v. Watson,* 591 F.2d 1058, 1062 (5th Cir. 1979) (applying subsection (c) independent of voluntariness inquiry under subsections (a) and (b)); *United States v. Gaines,* 555 F.2d 618, 623 (7th Cir. 1977) (acknowledging that trial judge retains discretion to exclude confessions for unreasonable pre-presentation delay over six hours); *United States v. Robinson,* 142 U.S. App. D.C. 43, 439 F.2d 553, 563-64 (D.C. Cir. 1970) ("18 U.S.C. § 3501(c) does not nullify this judicial rule of evidence, but only restricts its application"); *cf. Wilbon,* 911 F. Supp. at 1428 ("[Section] 3501 provides two independent bases for excluding confessions at trial: (i) voluntariness; and (ii) unreasonable delay ...."). Several prominent treatises concur with the Court's conclusion. *See* 24 Moore's Federal Practice 3d § 605.02[4][b] (1998)

479

judge committed "no clear error" in finding that the defendants voluntarily confessed to eight heinous murders on St. Croix, the Court of Appeals announced in that case that

> section 3501 makes admissibility of confessions dependent on their voluntariness. Delay in a defendant's presentation to a magistrate is only one factor relevant to voluntariness. 1968 [U.S.C.C.A.N.] 2127. Section 3501(c) modifies the trial judge's freedom to determine voluntariness by stating certain instances in which the judge cannot on the basis of delay alone find a statement to have been involuntary. Statements not within the categories defined in § 3501(c) are not excluded but instead their admissibility is determined by the general standard of voluntariness set forth in § 3501(a) and (b).

*Gereau,* 502 F.2d at 924 (citations omitted). *Gereau* relied almost exclusively on opinions from other Courts of Appeals that since have recognized their decisions as erroneous,[25] which gives pause to question *Gereau's* continued validity on this specific point.[26]

---

(reporting that Section 3501(c) merely "restricts [the McNabb-Mallory rule's] application to confessions obtained after a six-hour delay found to be unreasonable"); 3 WIGMORE ON EVIDENCE § 862(a) (James H. Chadbourn ed. 1970).

The Court's research indicates that at least two Circuit Courts of Appeals have concluded that Congress overrode the *McNabb-Mallory* exclusionary rule without resolving the conflict between section 3501(a) and 3501(c) or reviewing the statute's legislative history. *See United States v. Pugh,* 25 F.3d 669, 675 (8th Cir. 1994); *United States v. Christopher,* 956 F.2d 536, 538 538-39 (6th Cir. 1991).

[25] These decisions were *United States v. Marrero,* 450 F.2d 373 (2d Cir. 1971), and *United States v. Halbert,* 436 F.2d 1226, 1232-1237 (9th Cir. 1970). Both opinions neglected to review the entire legislative history of section 3501(c), and have since been corrected. *See Alvarez-Sanchez,* 975 F.2d at 1403-05 (distinguishing and departing from *Halbert); Perez,* 733 F.2d at 1033-34 (admitting that *Marrero* wrongly followed *Halbert,* which "failed to consider the only legislative history describing subsection (c)"). Like *Marrero* and *Halbert,* the Third Circuit Court of Appeals based its conclusion that "delay in a defendant's presentation to a magistrate is only one factor relevant to voluntariness" on the Senate Judiciary Committee's report on the original, proposed section 3501. *See Gereau,* 502 F.2d at 924. The *Gereau* Court did not acknowledge that the Senate amended the Omnibus Crime Act to preserve the federal courts' authority to suppress any confession obtained during unreasonable pre-presentation delay in excess of six hours, and this provision eventually was enacted. *See supra* section II.B.2 (discussing legislative history of 18 U.S.C. § 3501(c)).

[26] Moreover, *Gereau's* construction of section 3501(c) as prohibiting the trial court from considering delay under six hours in its voluntariness evaluation raises Constitutional concerns. Neither Congress nor the courts can establish a "bright line" rule excluding

Since *Gereau* is still on the books, this Court applies its voluntariness analysis to the April 17th confession and concludes that Superville did not confess voluntarily. By the time Agent Thomas interrogated the defendant on the 17th, Superville had languished in the St. Thomas jail for eight days. The District Court has held that "the conditions at [the St. Thomas jail] presently do not meet minimal, constitutional standards" and violate inmates' "rights under the Eighth and Fourteenth Amendments to the Constitution." *See Carty v. Farrelly*, 35 V.I. 400, 957 F. Supp. 727, 733 (D.V.I. 1997). The effect of Superville's lengthy incarceration cannot be overestimated.

In addition, Agent Thomas never told Superville why he could not leave the United States on April 9th, so it is doubtful that Superville knew that INS was investigating him for Social Security fraud. At the beginning of the April 17th interview, Thomas only told the defendant, "I want to take your sworn statement regarding your status in the United States."[27] Yet more than half of the fifty-two questions Thomas then asked Superville were directly related to how the defendant obtained and used a Social Security number. Moreover, although Thomas might have read INS Form I-214 to the defendant, he did not have him make a written acknowledgment and waiver of his rights before questioning. Most significantly, Superville was still without the assistance of counsel after being jailed in unconstitutional conditions for more than seven days. Agent Thomas' two hundred-hour delay in interviewing the incarcerated defendant on the Social Security fraud charges was totally unreasonable. The Court has no alternative but to conclude that Thomas "sweated" the confession out of Superville. Under these circumstances, the Court cannot declare with any confidence that the defendant validly waived his rights or that his

---

even slight delay in presentation from the this inquiry. The Fifth Amendment demands that trial judges survey the "totality of the circumstances" surrounding confessions. *See Withrow v. Williams*, 507 U.S. 680, 688-89, 123 L. Ed. 2d 407, 113 S. Ct. 1745 (1993). Subsection (b) demands the same. *See* 18 U.S.C. § 3501(b). Further, since section 3501(c) only applies to voluntary confessions, the trial judge must complete this voluntariness analysis before deciding whether a particular confession falls within the "safe harbor" provision. The government's explanation for any delay in presentation is irrelevant to the effect that delay has on a defendant's will to speak. *See Alvarez-Sanchez*, 975 F.2d at 1400; *Perez*, 733 F.2d at 1031.

[27] (See Def.'s Mot. to Suppress Statements, Ex. C (emphasis added).)

will was not overborne. Since the government has not proved by a preponderance of the evidence that Superville voluntarily confessed on April 17, 1998, that confession will be suppressed. *See United States v. Bethancourt*, 65 F.3d 1074, 1078 (3d Cir. 1995) (acknowledging that confessions are not admissible unless they were "the product of an essentially free and unconstrained choice"); *see also* 18 U.S.C. § 3501(a).

■ The Court will suppress Superville's second confession because it was not voluntarily given and the government has absolutely flaunted Rule 5(a)'s requirement that every arrestee must be brought before a judicial officer "without unnecessary delay." Law enforcement officers must not evince such blatant disregard for the law. "Our government is the potent, the omnipresent teacher. For good or ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law . . . ." *Olmstead v. United States*, 277 U.S. 438, 485, 72 L. Ed. 944, 48 S. Ct. 564 (1928) (Brandeis, J., dissenting), overruled by *Katz v. United States*, 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). INS may not set such an example in this case.

## C. Misleading Pre-Interrogation Warnings

Superville contends that his first statement must be suppressed because the warnings that the INS Inspectors read to him on April 9, 1998, misled him. The Court does not concur.

Senior Inspector Robertson testified that he informed Superville of his *Miranda* rights on April 9th by reading the "Warning As To Rights" section of INS Form I-214.[28] The Court credits Robertson's testimony that the warning was administered contemporaneously with the interrogation. Before asking Superville any questions,

---

[28] Form I-214 read:

Before we ask you any questions, you must understand your rights.
    You have the right to remain silent.
    Anything you say can be used against you in court, or in any immigration or administrative proceeding.
    You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
    If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

however, Inspector Haywood read INS Form I-867A to him.[29] Superville contends that the additional language of Form I-867A misled him because it qualified the *Miranda* warning on Form I-214 and rendered his waiver ineffective.

In its landmark *Miranda* decision, the Supreme Court required law enforcement officers to inform any suspect taken into custody that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda,* 384 U.S. at 479. Although Miranda warnings do not have to be given in those exact words, *see Duckworth v. Eagan,* 492 U.S.

---

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

(Def.'s Mot. to Suppress Statements, Ex. B.)

[29] Form I-867A read:

I am an officer of the United States Immigration and Naturalization Service, authorized by law to administer oaths and to take sworn statements. I want to take your sworn statement regarding your application for admission to the United States. Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview.

You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United states, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.

This may be your only opportunity to· present information to me and the Immigration and Naturalization Service to make a decision. It is very important that you tell me the truth. If you lie or give false information, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

Except as I will explain to you, you are not entitled to a hearing or review.

U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of fear.

Until a decision is reached in your case, you will remain in the custody of the Immigration and Naturalization Service.

Any statement you make may be used against you in this or any subsequent administrative proceeding.

Def.'s Mot. to Suppress Statements, Ex. C.)

195, 202, 106 L. Ed. 2d 166, 109 S. Ct. 2875 (1989), they must reasonably convey those rights to the defendant before custodial interrogation.[30]

Assigning some weight to the defendant's subjective belief that INS failed to properly apprise him of his rights, the Court does not believe that the warnings that Superville received actually misled him to waive his rights before his interrogation on April 9, 1998. Inspector Robertson recited the warning printed on Form I-214, which fully explicated the defendant's *Miranda* rights. This was INS' first formal statement to the defendant, and it consisted of five sentences. He could not have failed to hear it. Superville then saw the warning in print when he signed his name below it on the form. Since the record shows that the defendant could read, this procedure ensured that the defendant understood his Constitutional rights.[7] Inspector Haywood then commenced the interview by reading Form I-867A, which explained to the defendant why INS was questioning him. Among other things, Haywood warned Superville that "any statement you make may be used against you in this or any subsequent administrative proceeding." (Def.'s Mot. to Suppress Statements, Ex. C.) Form I-867A appears to have been designed primarily for use in administrative proceedings. At worst, Inspector Haywood's statement reinforced only part of Form I-214's statement that "anything you say can be used against you in court, *or in any immigration or administrative proceeding.*"[31] (Def.'s Mot. to Suppress Statements, Ex. B (emphasis added).) Her statement did not, however, limit or negate the original *Miranda* warning in any way.[32] The Court does not believe

---

[30] Incorrect warnings are not an effective safeguard for Fifth and Sixth Amendment rights. *See United States v. Cruz*, 910 F.2d 1072, 1075 n.5 (3d Cir. 1990) (ruling that police could instruct defendants that they "have the right to answer questions without an attorney" without vitiating proper Miranda warnings, but maintaining that defendants' "subjective opinion of what those words meant may sometimes be relevant").

[31] Form I-867A's warning that "if you lie or give false information, you may be subject to criminal . . . penalties" belies the argument that Inspector Haywood led Superville to believe that his statement could not be used against him in a criminal prosecution.

[32] Only the lawyerly mind used to interpreting phrases according to the principle of *statutory construction known as expressio unius exclusio alterius* would imagine otherwise. This rule states that "when certain persons or things are specified in a law, contract, or will, an intention to exclude all others from its operation may be inferred." BLACK'S LAW DICTIONARY 521 (5th ed. 1979).

that Haywood's reading of Form I-867A misled Superville or invalidated his waiver of rights. The defendant's statement of April 9, 1998, is admissible in evidence.

## III. DEFENDANT'S MOTION TO SUPPRESS HIS WORKERS' COMPENSATION FILE

Finally, Superville seeks to suppress the contents of his workers' compensation file as the product of an unreasonable search and seizure under the Fourth Amendment, which declares that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. Agent Thomas visited the Workmen's Compensation Division on April 15, 1998, to investigate whether the defendant had filed a claim. WCD did not allow Thomas to personally review Superville's file because he had not subpoenaed the agency's records. Under Virgin Islands regulations, WCD's director may refuse to disclose workers' compensation records absent a subpoena duces tecum, warrant, or other order. See V.I. R. & REGS. tit. 24, § 251-6. WCD personnel did tell Thomas, however, that the defendant had filed a claim and had received benefits. Superville contends that this disclosure by the Government of the Virgin Islands violated his Fourth Amendment rights.

In order to establish a Fourth Amendment violation, Superville must show that he possessed a legitimate expectation of privacy in the confidentiality of his WCD file. See Rawlings v. Kentucky, 448 U.S. 98, 103, 65 L. Ed. 2d 633, 100 S. Ct. 2556 (1980); Katz v. United States, 389 U.S. 347, 361, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967) (Harlan, J., concurring). The defendant cannot do so because he divested himself of control over the medical information at issue when he sought to obtain workers' compensation proceeds from WCD. Virgin Islands regulations expressly leave protection of workers' compensation records to the discretion of the WCD director,[33] who can release workers' compensation files to third

---

[33] See V.I. R. & REGS. tit. 24, § 251-6 (1992) (emphasis added):

Any information obtained for purposes of determination of Workers' Compensation rights and benefits . . . (including, but not limited to, Workers' Compensation

parties without claimants' consent. In addition, WCD personnel testified that third parties need not preserve the confidentiality of claimants' files.

By submitting information about his medical condition to WCD, Superville invited at least reasonable investigation into his physical injury claim. *Cf. Johnson v. Corporate Special Servs.*, 602 So. 2d 385 (Ala. 1992). He also gave Agent Thomas documents verifying his injury, including one that referred to workers' compensation and recited a Social Security number. The defendant thus revealed to INS the nature of his medical condition and that he had filed for workers' compensation benefits. He cannot now be heard to complain that the government violated his constitutional rights by reviewing his claim.

■ The Court finds that Superville did not have a reasonable expectation of privacy in his workers' compensation file because he knew that his claim was subject to investigation by the government, and he gave the investigating officer information concerning his claim. WCD's disclosure to a government agent, who sought only to confirm the story told by Superville and his documents, did not violate the defendant's Fourth Amendment rights. The Court will not suppress the contents of Superville's workers' compensation file.

## IV. CONCLUSION

David Anthony Superville's motion to suppress statements will be granted in part and denied in part. His motion to suppress his workers' compensation file will be denied. An appropriate order will issue.

staff notes, scientific or medical data, evaluations, or status reports) which is deemed by the Director of Workers' Compensation to be of such nature that any disclosure would not be in the best interest of the claimant, or any other party to the action, thereof, shall not be disclosed to any party not associated directly with the case.