**UNITED STATES**

**v.**

**Ivo HONGLA–YAMCHE.**

**No. CR 98–10296–JLA.**

United States District Court,
D. Massachusetts.

June 15, 1999.

Nadine Pellegrini, Assistant United States Attorney, United States Attorney's Office, Boston, MA, for Plaintiff.

George F. Gormley, Gormley & Colucci, P.C., Boston, MA, for Defendant.

ORDER ON DEFENDANT'S MOTION TO DISMISS THE COMPLAINT AND MOTION TO SUPPRESS OR OTHERWISE EXCLUDE EVIDENCE

ALEXANDER, United States Magistrate Judge.

In a one count information, the Government has charged Defendant Ivo Hongla–Yamche ("Hongla–Yamche") with violating the Endangered Species Act, 16 U.S.C. §§ 1538(c)(1) & 1540(b)(1). Defendant has moved this Court to Dismiss the Information and the charges against him or, in the alternative, to suppress certain evidence at his trial, alleging that the evidence against him was obtained in contravention of the Vienna Convention on Consular Relations. The parties appeared before this Court on May 17, 1999, for a hearing on Defendant's motions. Assistant United States Attorney Nadine Pellegrini appeared on behalf of the United States, and Attorney George Gormley appeared on behalf of Hongla–Yamche. The Court took the matter under advisement.

Defendant's motions require this Court to examine a matter of first impression in this Circuit: first, does Hongla–Yamche have standing to seek relief for the U.S. Customs Service's alleged violation of the Convention, second, if so, did the Customs examination of Hongla–Yamche trigger the consular notification provision of the Convention, and third, if the provision was triggered, is either dismissal of the complaint or application of the exclusionary rule the proper remedy for a violation of the Convention. After due consideration and for the following reasons, Defendant's motions are hereby DENIED.

*Facts*

On December 16, 1997, at 5:04 p.m., Hongla–Yamche arrived at Logan Airport on a flight from Brussels. (Government's Opposition to Motions at Att. A (McElroy Aff.) & Ex. A.) Hongla–Yamche was returning from a visit to Cameroon, his country of citizenship, to the United States where he is a legal resident alien. (Hongla–Yamche Aff.) Hongla–Yamche was contacted by United States Senior Customs Inspector George R. McElroy ("McElroy") in the baggage area of Terminal E. McElroy asked Hongla–Yamche some questions regarding the information he had recorded on his Customs Declaration Form. (Gov.'s Ex. 1.) Specifically, he inquired about the three thousand dollars worth of merchandise Hongla–Yamche had reported, and the destination from which he had traveled. Based on the reported value of the merchandise Hongla–Yamche was carrying, and the fact that West Africa is considered a source country for narcotics, McElroy decided to refer Hongla–Yamche to secondary inspection. (McElroy Aff.)

In the secondary inspection area, a location in the baggage area separated from the rest of the baggage area by a large curtain, McElroy and Hongla–Yamche were joined by Senior Customs Inspector James Manning ("Manning"). Hongla–

Yamche had two bags, one that had been checked, and one piece of carry on luggage. Both bags were searched, and a total of thirty-two pieces of African elephant ivory were found in Defendant's bags-twenty-five carved figurines, and seven bracelets. Hongla–Yamche confirmed that they were ivory. Manning asked Hongla–Yamche if it was illegal to possess ivory in Cameroon, and Hongla–Yamche responded that it was illegal to possess "raw" (uncarved) ivory. Hongla–Yamche had indicated on his Customs Declaration Form that he was not carrying any "wildlife products." (Gov.'s Ex. 1.) McElroy placed a notation on Hongla–Yamche's declaration form at the time the search of his baggage was being conducted stating that it was 1732 (5:32 p.m.). (McElroy Aff.)

After the baggage search, the inspectors told Hongla–Yamche that the ivory would be detained and then transferred to the U.S. Fish and Wildlife Service Department. McElroy completed a Custody Receipt for Retained or Seized Property, and the time noted on that form was 1745 (5:45 p.m.). Manning gave the defendant a pamphlet from the U.S. Fish and Wildlife Service on federal wildlife laws. McElroy estimates that the entire process was completed by 6:30 p.m. (Id.) He did not recall if he or Manning had queried the defendant about drugs. (Id.) Manning testified that there was no conversation regarding drugs. McElroy deposed that Hongla–Yamche was not frisked or patted down, although he may have been asked to empty his pockets on the table. (Id.)

Inspector Christopher Edward Dowd ("Dowd") of the Fish and Wildlife Service Department testified that he met with Hongla–Yamche in February of 1998 at a Wendy's restaurant in Natick. After notifying Hongla–Yamche that he was not under arrest, and that his statements would be voluntary, Hongla–Yamche told Dowd that he had been searched on each of the three occasions that he entered the U.S., including the December 16, 1997, entry.

Although these prior entries were not the subject of the conversation between Hongla–Yamche and Dowd, Dowd testified that Hongla–Yamche never indicated that he had been arrested, frisked, or questioned about drugs during any of these Customs searches.

Hongla–Yamche alleges that he was questioned about drugs, that he was searched and hit in the stomach, that an officer went through his pockets, and that he spent two hours in the secondary inspection area before he was released. There is no dispute that passengers are not free to leave Terminal E until the Customs inspection is completed.

*Analysis*

Hongla–Yamche now seeks either to have the complaint dismissed, or to have the following evidence suppressed at trial: (1) all statements made by him to agents of the Law Enforcement Division of the United States Fish and Wildlife Service Department and to any other agents of the government on or about December 16, 1997; (2) the box of assorted ivory figurines and bracelets seized from him at the airport on December 16, 1997; and (3) the fruits derived from the seizure of these tangible objects and any and all testimony related to their seizure. As grounds for exclusion or dismissal, he alleges that the evidence against him was obtained in contravention of Article 36(1)(b) of the Vienna Convention on Consular Relations, *in force*, March 19, 1967, 21 U.S.T. 77, 596 U.N.T.S. 261, *available in* 1967 WL 18349(TIA) ("Convention").

The Government opposes the motions on the grounds that under the factual circumstances of the customs search, the consular notification provision of Article 36 was never triggered, and is thus inapplicable to the Defendant.

Article 36 states:

"Communication and contact with nationals of the sending State

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

(a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the Sending state if, within its consular district, a national of that State is *arrested or committed to prison or to custody pending trial or is detained in any other manner.* Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this subparagraph;*

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody, or detention if he opposes such action.

2. *The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State,* subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended. Vienna Convention on Consular Relations, 1967 WL 18349(TIA) at \*10–11 (emphasis supplied)."

*Article 36 Establishes An Individual Right*

Under the Supremacy Clause of the United States Constitution, which declares that "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land," U.S. CONST. art. VI, cl. 2, federal agencies are obliged to observe Article 36 of the Vienna Convention. *See also Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888) ("[b]y the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation."). It is apodictic that, where treaty provisions establish individual rights, these rights must be enforced by the courts of the United States upon the request of the individual. *See Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 442, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989); *United States v. Rauscher,* 119 U.S. 407, 418–19, 7 S.Ct. 234, 30 L.Ed. 425 (1886) (citing *Head Money Cases,* 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884)).

■ The preamble of the Convention states that "the purpose of [the Convention's] privileges and immunities is not to benefit individuals, but to ensure the efficient performance of functions by consular posts on behalf of their respective states." 1967 WL 18349(TIA) at \*1. This would seem to indicate that the drafters of the Convention did not intend to confer enforceable rights upon individuals. The text of Article 36—a more persuasive source for determining the parties' intent—directs authorities, however, to inform a foreign national of "*his rights* under [sub paragraph (1)(b) ]" *Id.* at \*10 (emphasis supplied). The language of Article 36 clearly refers to the existence of an individual right.

Many courts, and at least one commentator, who have considered the issue have implied, or explicitly held, that the Con-

vention does confer an individual, enforceable right that vests an injured party with standing to seek redress. *See Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529, exact page number not yet available, 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (per curiam) ("[the Convention] arguably confers on an individual the right to consular assistance following arrest"); *United States v. Lombera–Camorlinga,* 170 F.3d 1241, 1242–43 (9th Cir.1999) (holding that individual foreign nationals have rights under Article 36(1)(b) and that those individuals have standing to enforce their rights in courts of the United States); *United States v. Ademaj,* 170 F.3d 58, 66–68 (1st Cir.1999) (considering a claim of a violation of the Convention without addressing the issue of standing); *Villafuerte v. Stewart,* 142 F.3d 1124, 1125 (9th Cir.1998) (same); *Faulder v. Johnson,* 81 F.3d 515, 520 (5th Cir.1996) (same); *United States v. Alvarado–Torres,* No.Crim. 98–3351–R, 1999 WL 236197, at *2 (S.D.Cal. Apr.19, 1999) (holding that Article 36 creates individual rights and that aggrieved national has standing to enforce the right); *United States v. Superville,* No.Crim.1998–112, 1999 WL 166990, at *2–4 (D.Virgin Islands Mar.19, 1999) (same); *Breard v. Netherland,* 949 F.Supp. 1255, 1263 (E.D.Va.1996) (considering a claim of a violation of the Convention without addressing the issue of standing), aff'd, 134 F.3d 615 (4th Cir.1998); *United States v. Esparza–Ponce* 7 F.Supp.2d 1084, 1096 (S.D.Cal.1998) (refusing to "definitively decide this muddled issue [of standing]" but addressing merits of claim of violation nevertheless); *Mami v. Van Zandt,* No. 89–CIV–0554 (TPG), 1989 WL 52308, at *1 (S.D.N.Y. May 9, 1989) (same); *see also* Mark J. Kadish, Article 36 of the Vienna Convention on Consular Relations: Search for the Right to Consul, 18 Mich. J. Int'l L. 565, 594–602 (1997) (summarizing Convention's history and recognizing that the intent of its drafters was to afford an individual right to consular access). *But see Republic of Paraguay v. Allen,* 949 F.Supp. 1269, 1274 (E.D.Va.1996) (suggesting that Convention does not confer a private enforceable right), aff'd, 134 F.3d 622 (4th Cir.1998).

■ Based on the language of the Article, and in light of this elephantine body of authority, this Court finds that Article 36 of the Vienna Convention does confer an individual right to consular notification, and that Hongla–Yamche has, therefore, standing to contest the alleged violation of that right.

*The Customs Inspection Did Not Trigger the Consular Notification Provision*

Hongla–Yamche was neither arrested, nor committed to prison or custody at the time of the Customs inspection.[1] He argues that the secondary inspection amounted to a detention for purposes of triggering the agency's legal obligation under the Convention to inform him of his rights pursuant to Article 36.

■ The United States Department of State has issued a booklet entitled Consular Notification and Access that provides instructions to federal, state and local law enforcement agencies to assure the compliance of the United States with its consular legal obligations. *See* U.S. Dept. of State, Consular Notification and Access <*http://www.state.gov*>. The State Department's interpretation of the Convention's provisions may not be dispositive, but it is entitled to this Court's deference. *See Alvarado–Torres,* 45 F.Supp.2d 986, 995 (citing *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 184–85, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982); *Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961); *Kim v. District Director,* 586 F.2d 713, 715–16 (9th Cir. 1978)).

---

1. Hongla–Yamche was arrested on January 20, 1999 for failing to appear for arraignment on the Information charging him with the violation of the Endangered Species Act. The Government did not move for detention, and Hongla–Yamche was released on conditions.

In a section entitled Frequently Asked Questions, the State Department provides the following answer to the question of what kinds of detentions are covered by the obligation:

> "While there is no explicit exception for short detentions, the Department of State does not consider it necessary to follow consular notification procedures when an alien is detained only momentarily, e.g., during a traffic stop. On the other hand, *requiring a foreign national to accompany a law enforcement officer to a place of detention may trigger the consular notification requirements, particularly if the detention lasts for a number of hours or overnight.* The longer a detention continues, the more likely it is that a reasonable person would conclude that the Article 36 obligation is triggered." U.S. Dept. of State, Consular Notification and Access at 19 (emphasis supplied).

Similarly, in response to the question of whether or not officers have a duty to inform and notify when the detention takes place during the writing of a traffic citation or other similar brief time, the answer states:

> "The purpose of [the consular notification] requirement is to ensure that a government does not place an alien in a situation in which the alien cannot receive assistance from his/her own government. *When an alien is cited and immediately released, this consideration is not relevant because the alien is free to contact the consular officials independently.* The Department of State does not consider brief routine detentions, such as for traffic violations or accident investigations, to be the type of situation contemplated by the VCCR." *Id.* (emphasis supplied).

■ The State Department's interpretations suggest that a routine Customs inspection is not the sort of situation that will trigger the consular notification provision of the Convention. In determining whether the particular Customs search at issue here triggered the Article 36 provision, it is useful to compare First Circuit precedent relevant to the determination of whether a Customs inspection constitutes custodial interrogation for the purposes of triggering the obligation to provide Miranda warnings.[2]

The First Circuit has made it perspicuously clear that in determining if custody arose, the "ultimate inquiry is whether there was a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Ventura*, 85 F.3d 708, 710 (1st Cir.1996) (*Ventura I*) (citing *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)). Moreover, routine Customs questioning does not require Miranda warnings. *See United States v. Tajeddini*, 996 F.2d 1278, 1288 (1st Cir. 1993).

The Court in *Ventura I* took special pains to clarify that the mixed factual and legal question of whether or not an individual is in custody should not be answered in a per se manner wherein an individual will automatically be found to have been in custody if she could not simply walk away from an interrogating officer. *See Ventura*, 85 F.3d at 712. Rather, the custody determination is highly fact specific and requires inquiry into all the circumstances surrounding the interrogation. *See id.* The Court wrote: "Individuals subject to *routine traffic stops or customs inspections, circumstances which are not custodial,* are rarely free to leave while being questioned by an officer. The relevant inquiry, however, as stated above, is

---

**2.** In so doing, this Court in no way equates the right to consular notification provided by Article 36 with the fundamental right protected by the holding in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which traces its roots to the rights afforded in the 5th Amendment of the United States Constitution. *See also, Waldron v. INS,* 17 F.3d 511, 518 (1993), *cert. denied, Waldron v. INS,* 513 U.S. 1014, 115 S.Ct. 572, 130 L.Ed.2d 489 (1994).

whether there was an arrest or restraint on freedom of movement of the degree associated with formal arrest." *Id.* (emphasis supplied).

■ This language is instructive for two reasons. First, it indicates that the First Circuit places routine customs inspections in the same category as routine traffic stops for purposes of the custodial interrogation analysis. Based on this fact, this Court believes that the First Circuit would apply a similar test to a determination of whether or not a routine customs stop amounted to detention for purposes of triggering the Article 36 notification obligation. Secondly, it indicates that the question of whether or not "[t]he line between routine Customs questioning and custodial interrogation," *id.* at 711, has been crossed can only be answered after all of the circumstances surrounding the examination have been considered.

In *United States v. Pratt,* 645 F.2d 89 (1st Cir.1981) *cert. denied,* 454 U.S. 881, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981), the Court rejected the defendant-appellant's challenge to the district court's refusal to suppress evidence of his comments made during a secondary Customs inspection on the grounds that the inspection was custodial and he was not given Miranda warnings. In *Pratt,* Customs agents made the decision to subject the defendant to secondary inspection based on the facts that he was traveling from a country known to be a "source country" for drugs, had purchased his ticket in cash, and was wearing bulky clothes. *See id.* at 90. The defendant was led by two agents to a windowless, seven by five foot inspection room where he was told to empty his pockets.

*See id.* The agents conducted a pat down search, inspected his luggage, and questioned him about an airline ticket they found on his person. *See id.* The inspection lasted approximately fifteen minutes.

In deciding that the inspection did not constitute custody for Miranda purposes, the Court emphasized the importance of three specific factors: (1) the agent's questioning was limited and the questioning was not a manipulative attempt to elicit a confession; (2) the questioning was routine in that no events transpired to create or symbolize a high and evident degree of suspicion about the defendant; and (3) the duration of the encounter supported a characterization of a routine customs inquiry. *See id.* at 90–91. As to the third factor, the Court noted that the duration of the encounter would never be a singly determinative factor. *See id.* at 91.

The Court acknowledged that an individual required to submit to a secondary Customs inspection may "apprehend some increased level of official suspicion," but observed that "this perception of increased official suspicion is not sufficient by itself to apply coercive pressures equivalent to custodial questioning (citation omitted) ... police are not required to give Miranda warnings to everyone they question.... This admonition has special application to airport customs inspections, where individuals approach official inquiry knowing of its greater necessity and routine." *Id.* at 90.

■ Here, Hongla–Yamche was detained in an area within the baggage area of Terminal E but separated from it by a curtain. He was questioned primarily by two agents.[3] There is no dispute that he

---

3. At the hearing, McElroy testified that he and Manning were the two seizing officers. Neither McElroy nor Manning testified that a third inspector had been involved, and the affidavit of McElroy does not state that a third inspector was present. In his own affidavit, Hongla–Yamche does not mention the presence of a third inspector. At the hearing, however, Hongla–Yamche testified that a third, plain clothed inspector had been pres-

ent. McElroy testified that the Customs Agents are plain clothed, and that Hongla–Yamche may have had some contact with a Customs Agent, although he could recall no such occurrence. Even if this were true, it would not be dispositive of the issue. Additionally, Hongla–Yamche's affidavit differs from his in-court testimony in several other respects. In Court, he claimed to have been taken to a separate room by a plain clothed

was questioned about the value of the merchandise ·he reported on his declaration, and about the ivory. The questioning was straightforward, and the nature of the questioning was not coercive. McElroy's affidavit states that it would be routine for him to question anyone declaring three thousand dollars in merchandise on his or her declaration. (McElroy Aff.) He testified that his initial questions were asked in order to determine if the merchandise was acquired ·abroad, and when Hongla–Yamche answered yes, McElroy then wanted to see the merchandise to determine if it was dutiable. This is a reasonable, routine, and limited line of questioning.

Hongla–Yamche alleges that he was asked if he was carrying any drugs. Neither Manning nor McElroy recalled questioning Hongla–Yamche about drugs-an assertion that gives this Court some pause considering that Hongla–Yamche was traveling from a known drug source country. Even if the question did arise, however, there is nothing to indicate that it was coercive or outside the realm of routine questioning given Hongla–Yamche's itinerary.

As in *Pratt,* the questioning here was wholly routine. There were no events that caused the Inspectors to harbor a strong or heightened suspicion of Hongla–Yamche. Hongla–Yamche was returning from a country known to be a source country for narcotics, and he reported that he had three thousand dollars worth of merchandise in his possession-two reasons that

routinely form the basis for an Inspector's decision to conduct a secondary inspection. *See e.g., Pratt* 645 F.2d at 90 (questioning routine where agents based decision to conduct secondary inspection on fact that defendant was traveling from known drug source country, paid for plane ticket in cash, and wore bulky clothes).

Finally, the amount of time Hongla–Yamche was detained does not tip the scale in favor of finding that the Customs search constituted detention. The plane landed at 1704 (5:04 p.m.). (Gov.'s Opp. at Ex. A.) According to the Customs Declaration Form (Gov.'s Ex. 1), and McElroy's affidavit, it was 1732 (5:32 p.m.) when the secondary inspection of Hongla–Yamche's bags was being conducted. The Custody Receipt for Retained or Seized Property (Gov.'s Ex. 3), indicates that it was 1745 (5:45 p.m.) when that form was being completed. This was necessarily after the search of Hongla–Yamche's luggage. The form was explained to the Defendant, he was given some information, and according to McElroy's affidavit, the entire process was over by 1830 (6:30 p.m.). Assuming a few minutes passed before McElroy marked the Defendant's Declaration Form, the secondary examination lasted approximately one hour.

■    Placed within the context of the examination as a whole, there is nothing to indicate that the duration of the examination was not routine. The length of the examination is reasonable given the number of fulvous figurines that Hongla–

---

inspector where he was given a pat down search by Inspector Manning, told to cough, and punched in the stomach. He also testified that Agent Manning asked him if he had any drugs, and that he was kept in this room until Manning gave him permission to leave sometime shortly after 8:00 p.m. His affidavit, however, does not mention anything about being taken to a location other than the secondary inspection area. It also fails to mention anything about being hit in the stomach or being given a pat down search. It does state that Hongla–Yamche was questioned about the ivory, and about whether he had any drugs in his possession, and that he was

searched and that an officer searched his pockets. Importantly, Hongla–Yamche states in his affidavit that he was held in the secondary inspection area for approximately two hours before he was released. Given that the secondary search was already underway at 5:32 p.m., this would place his release at approximately 7:30 p.m. This too contrasts with his in Court testimony which placed his release at sometime shortly after 8:00 p.m. These contradictions between Hongla–Yamche's sworn affidavit and his in court testimony gives this Court pause and raises doubts as to Hongla–Yamche's credibility.

Yamche possessed, the fact that each of these had to be accounted for on the chain of custody form, and that the Inspectors needed to provide information to the Defendant regarding the violation and where the ivory would be taken. In *Ventura II,* the First Circuit, discussing a lengthy secondary customs search, wrote "... even if the questioning did take one hour and twenty minutes, we have already concluded that the other circumstances of the questioning were routine. The duration of the encounter is never a singly determinative factor (citation omitted) and the duration in this case was not extraordinary. We are not prepared to say Customs inspections cannot take this long without becoming an arrest, or even that a delay of this length is strongly indicative of arrest." 132 F.3d 844, 848 (1st Cir.1998); *see also United States v. Park,* 947 F.2d 130, 133 (5th Cir.1991) (no arrest where Customs inspection lasted three to four hours) *vacated in part on other grounds,* 951 F.2d 634 (5th Cir.1992).

■ Defendant cites to the Ninth Circuit's recent decision in *Lombera–Camorlinga* for support of his argument. That case, however, was decided on facts very different from those before the Court today. There, the defendant was actually arrested after Customs inspectors searched his vehicle and found a large amount of marijuana. Before questioning, he was given his Miranda warning, but the officers failed to warn him of his rights under Article 36.[4] There was no question that the defendant in *Lombera–Camorlinga* had been arrested for purposes of triggering the consular notification provision of Article 36.

This Court agrees with the Government that to accept the defendant's reasoning would logically result in an obligation to provide consular notification upon every

routine secondary Customs inspection. This result would be a distortion of the rule beyond recognition, and is not the purpose for which the Article was drafted—"to ensure that a government does not place an alien in a situation in which the alien cannot receive assistance from his/her own government." U.S. Dept. of State, Consular Notification and Access at 19. When, as here, an alien is cited and immediately released, the protections of Article 36 "are not relevant because the alien is free to contact the consular office independently." *Id.*

The Supreme Court has stated that "Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). "Import restrictions and searches of persons or packages at the national border rest on different considerations and different rules of constitutional law from domestic regulations.... Historically, such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry." *Id.* at 537–38, 105 S.Ct. 3304

Routine customs searches have long been practiced in the United States, and Customs officials are charged with a duty to protect the integrity of our borders. To impose a per se rule on Customs officials requiring consular notification upon every routine secondary Customs inspection would place an undue burden on the important gatekeeping function of Customs officials. Rather, sound policies and analogous legal precedent augur in favor of

---

4. Moreover, in *Lombera–Camorlinga,* the Ninth Circuit announced that upon a showing that the Vienna Convention was violated by a failure to comply with the consular notification provision, the defendant in a criminal proceeding has the initial burden of producing evidence showing prejudice resulting from the violation. *See* 170 F.3d at 1244. If the defendant meets that burden, the burden then shifts to the government to rebut the showing of prejudice. *See id.*

careful factual analysis of claims of Article 36 violations for failure to notify during a Customs inspection.

Based on the foregoing, this Court finds that the secondary Customs examination of Hongla–Yamche did not constitute detention for purposes of triggering the consular notification provision of Article 36.

Because this Court has found that Hongla–Yamche was not detained, the Court need not decide whether suppression of evidence or dismissal of the complaint are appropriate remedies for violations of Article 36.

Accordingly, the Defendant's motions are hereby DENIED.

SO ORDERED.