**UNITED STATES OF AMERICA, Plaintiff**

**v.**

**WILBERT BRISCOE, Defendant**

Crim. No. 1999-133

District Court of the Virgin Islands

Div. of St. Thomas and St. John

October 15, 1999

SARAH L. WEYLER, ESQ., St. Thomas, U.S.V.I., *for plaintiff*

PAMELA L. WOOD, ESQ., St. Thomas, U.S.V.I., *for defendant*

MOORE, D.J.

## MEMORANDUM

On May 20, 1999, a grand jury returned a four-count indictment accusing defendant Wilbert Briscoe ["Briscoe"] of falsely representing himself as a United States citizen, impeding and assaulting a special agent of the United States Immigration and Naturalization Service ["INS"], using a firearm to impede or assault an employee of the United States, and stealing a firearm from the United States, in violation of 18 U.S.C. §§ 911, 111(a)(1) and (b), 924(c), and 642, respectively. Briscoe has moved to suppress the statement made by

447

him to the INS and the Federal Bureau of Investigation ["FBI"]. The Court took evidence at a hearing on August 19, 1999, after which the Court granted leave for the government to supplement its opposition. The government filed its supplement on September 23, 1999.

## I. FACTS

On December 23, 1996, INS Special Agents Joan Nash ['Nash'] and Allison Haywood ['Haywood'] went to the office of the Supervisor of Elections to investigate a complaint that an individual, who turned out to be Briscoe, had fraudulently applied for a voter identification card in the name of Raymond Iven Rhymer. When he returned to pick up his card, Haywood and Nash were waiting. Haywood told Briscoe that they would have to detain him, and Nash attempted to apply handcuffs. The government alleges that Briscoe resisted and somehow got his hands on Nash's service firearm. Pointing the gun at Nash and Haywood, Briscoe backed out of the office. Once he got outside, the prosecution says Briscoe discharged the weapon and fled.

Four months later on April 20, 1999, at about 10:00 a.m., INS and FBI agents ["agents"] arrested Briscoe in Fort Lauderdale, Florida. The agents transferred him to the local FBI office, where they read him his *Miranda* warnings. The agents did not advise Briscoe, a Jamaican national, that he had a right to contact the Jamaican consulate. Briscoe signed an advice of rights form at about 12:15 p.m. and then made an oral statement admitting to the events of December 23, 1996. After spending the night in jail, Briscoe was taken before a United States magistrate judge at 11:00 the next morning.

Briscoe first appeared in this Court on May 12, 1999. One day later, FBI Special Agent Steven Harker informed the Jamaican consulate that their national, Wilbert Briscoe, had been arrested. To date, there is no evidence that Jamaican consular officials have provided any assistance to Briscoe, even after Agent Harker contacted them.

## II. DISCUSSION

Mr. Briscoe has moved to suppress his April 20, 1999 statement on the following grounds: (1) the agents did not read him his

*Miranda* rights; (2) he did not sign an advice of rights or waiver of rights form; (3) his statement was involuntary and obtained against his will; (4) the agents did not present him to the magistrate judge "without unnecessary delay" as required under Federal Rule of Criminal Procedure 5(a); (5) the agents did not tell him of his right under the Vienna Convention on Consular Relations ["Vienna Convention"] to contact his consulate; and (6) the INS and FBI agents failed to comply with their respective obligations regarding the arrest of a foreign national contained in 8 C.F.R. § 236.1(e) and 28 C.F.R. § 50.5.

## A. The Defendant's Miranda Rights

■ Before law enforcement officers may question an individual who is in custody, they must warn the individual of his or her Constitutional rights. *See Miranda v. Arizona*, 384 U.S. 436, 478-79, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). Once a defendant challenges the admissibility of any statements made while in custody, the government must prove that the defendant was advised of and understood the *Miranda* rights and that he or she validly waived those rights. If the prosecutor cannot establish both the warning and the waiver by a preponderance of the evidence, the statements must be suppressed.

### 1. *Briscoe Was Read His Miranda Rights*

■ At the suppression hearing, FBI Special Agent Ortiz testified that he read Briscoe his rights from an advice of rights form within two hours of the defendant's arrest. INS Agent Anthony Di Biasi ["Di Biasi"] was present during the entire advice of rights. Di Biasi testified that he was familiar with Jamaican speech patterns, having lived in Jamaica for several years, and that he helped make sure that Briscoe understood his Constitutional rights by "translating" American English into Jamaican English and visa-versa. Both agents testified that Briscoe signed the advice of rights form only after he acknowledged that he understood the rights that they had read to him. Briscoe took the stand and denied that he signed the form and claimed that he did not understand the rights on the form because he cannot read. Even assuming that the defendant cannot read, the government nevertheless proved that the agents read his rights to him, and that he understood them.

449

## 2. *Briscoe Waived His Miranda Rights*

A valid waiver of *Miranda* rights must be knowing, voluntary, and intelligent. *See Miranda*, 384 U.S. at 444. The inquiry into the validity of a waiver of Miranda rights "has two distinct dimensions." *Colorado v. Spring*, 479 U.S. 564, 572, 93 L. Ed. 2d 954, 107 S. Ct. 851 (1987) (quoting Moran v. Burbine, 475 U.S. 412, 421, 89 L. Ed. 2d 410, 106 S. Ct. 1135, (1986)). The waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Spring*, 479 U.S. at 572 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 61 L. Ed. 2d 197, 99 S. Ct. 2560, (1979)).

The Court must "consider the totality of circumstances surrounding [Briscoe's] statement and determine if that statement was the result of a knowing, voluntary, and intelligent waiver of the protections implicit in the *Miranda* warnings." *United States v. Tyler*, 164 F.3d 150, 158 (3d Cir. 1998). Such circumstances vary according to the facts of the particular case, including the background, experience, and conduct of the suspect, *see Oregon v. Bradshaw*, 462 U.S. 1039, 1046, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1983), as well as any indicia of coercion.[1] In addition, the government has the burden of proving the waiver by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168-69, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986).

The criteria for assessing the voluntariness of Briscoe's waiver of his *Miranda* rights are the same for determining the voluntariness of statements generally.[2] No evidence was presented that Briscoe was intimidated, coerced, or deceived, or that the conditions of his custody created any special coercive pressures. The Court finds, therefore, that Briscoe voluntarily waived his *Miranda* rights.

---

[1] *See Spring*, 479 U.S. at 573-74 (listing the "traditional" indicia of coercion: the duration and conditions of detention, the attitude of the interrogators, defendant's physical and mental state, and other pressures affecting his powers of resistance and self-control).

[2] Many of the cases discussing the relevant circumstances preceded *Miranda v. Arizona*, and involve the voluntariness of confessions rather than waiver of *Miranda* rights. *See* discussion *infra* Part II.B.

450

Briscoe argues that, even if he had been given his *Miranda* warning, he could not have knowingly and intelligently waived them because he did not understand the American English spoken by the agents. Differences in the language or dialect spoken by the defendant and his interrogators are part of the totality of the circumstances the Court must consider.[3] The Court notes that Jamaica is an English-speaking country and there is very little difference between the American and Jamaican dialects. Further, Agent Di Biasi's participation in the warning and waiver offset any claim that Briscoe had difficulty understanding American English. Indeed, Briscoe's ability to participate in and testify at the suppression hearing without the need of a "translator" of American English to Jamaican English belies his claim that he did not understand the agents. The Court observed the testimony of both the agents and Mr. Briscoe, and credits the evidence that the advice of rights took only one minute and that Briscoe acknowledged that he understood his rights. The Court rejects Briscoe's testimony that he did not sign the waiver of rights form based on the credible testimony that he did sign his name on the form where his signature appears.[4]

From the totality of the circumstances, the Court finds that the government has sustained its burden of showing by the preponderance of the evidence that Briscoe did knowingly, voluntarily, and intelligently waive his *Miranda* rights after they were read to him. He was neither coerced nor deceived into waiving his rights at the interrogation. Therefore, this Court will not suppress his subsequent statement on *Miranda* grounds.

---

[3] *See United States v. Heredia-Fernandez*, 756 F.2d 1412, 1415 (9th Cir.) ("[L]anguage difficulties may impair the ability of a person in custody to waive [his *Miranda*] rights in a free and aware manner.").

[4] *See North Carolina v. Butler*, 441 U.S. 369, 373, 60 L. Ed. 2d 286, 99 S. Ct. 1755 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case.")

451

## B. The Voluntariness of the Defendant's Statement

Briscoe argues that his statement was not voluntary because the agents intentionally timed his arrest so they could extract his confession during the delay in presenting him to a magistrate judge and because they did not effectively inform him of his rights before questioning him.

■ The Court determines the voluntariness of a confession by looking at the totality of the circumstances to decide whether it was coerced or the product of a rational intellect and a free will. *See Withrow v. Williams*, 507 U.S. 680, 693, 123 L. Ed. 2d 407, 113 S. Ct. 1745 (1993). Those potential circumstances include not only "the crucial element of police coercion," but also the setting of the interrogation, its length and continuity, the defendant's mental and physical condition, his education and maturity, any failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation, and any delay in bringing the defendant before a magistrate judge. *Id.* at 693-94.

Title 18 U.S.C. § 3501(b), which codifies the totality of the circumstances test for criminal prosecutions brought by the United States, states:

> The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

452

The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

Although Briscoe does not allege that the agents coerced him through violence or threats, he does challenge the circumstances of the interrogation, including the agents' failure to promptly present him before a magistrate judge or to advise him of his rights, as well as his status as a foreign national and attendant inability to fully understand the interrogation.

The delay that occurred between the time of the defendant's arrest and his presentment before the magistrate judge does not support his allegation of a design to elicit a confession. The government established, and the defendant has not refuted, that the agents presented him to the Broward County magistrate judge the following day at the next available time the magistrate had scheduled such presentments. Briscoe's claim that the agents purposely arrested him at 10:00 a.m. on April 20, 1999, so that he would have to miss that day's 11:00 a.m. arraignments and spend the day in custody is unfounded.

Nor does evidence support the defendant's claim that his statement was involuntary because he did not receive a valid advice of rights.[5] The Court has already found that the agents read Briscoe his *Miranda* warnings, see discussion supra Part II.A.1, thereby satisfying this element of the totality analysis. Furthermore, other than his unfounded claim of difficulty with American English, there is no allegation or evidence that Mr. Briscoe's mental or physical condition, education, or level of maturity interfered with the voluntariness of his confession.

Finally, the setting of the interrogation was not coercive. The agents brought Briscoe to the FBI office within an hour of his arrest.

---

[5] Even before its decision in *Miranda v. Arizona*, the Supreme Court considered whether a defendant had been advised of the right to remain silent, have an attorney, and that anything he said could be used against him, as relevant circumstances in determining the voluntariness of a confession. *See Haynes v. Washington*, 373 U.S. 503, 516-17, 10 L. Ed. 2d 513, 83 S. Ct. 1336 (1963) ("the fact that a defendant is not reminded that he is under arrest, that he is not cautioned that he may remain silent, that he is not warned that his answers may be used against him, or that he is not advised that he is entitled to counsel," bear on the voluntariness and admissibility of his confession).

Once there, they took him to an interview room and handcuffed one of his hands to a metal bar at desk height. Four agents were present for the interrogation. None of them threatened Briscoe. The agents testified that they offered him a doughnut and beverage and that he appeared calm. Finally, there was no extended period of interrogation before Briscoe made his incriminating statement.

■ Having examined and weighed the totality of the circumstances surrounding Briscoe's interrogation, the Court finds that his statement to the agents was voluntary. Any delay between his arrest and presentment to a judicial officer did not oppress his free will. The agents advised Briscoe of his right to remain silent and to have counsel present during his custodial interrogation, and they informed him that anything he said could and would be used against him. He understood and waived these rights. There was no coercion by the agents, nor were the conditions of the questioning out of the ordinary or inherently coercive. The government has met its burden of proving by a preponderance of the evidence that Briscoe's statement was voluntarily made.

## C. Rule 5(a) and Its Statutory Safeharbor

Briscoe separately asserts that the Court must suppress his statement because of "unnecessary delay" in presenting him to a magistrate judge under Rule 5(a) of the Federal Rules of Criminal Procedure."[6] A statement found to be voluntary may nonetheless be excluded if it runs afoul of the *McNabb-Mallory* exclusionary rule, which renders inadmissible in federal cases any confession obtained from an arrestee who was not brought before a judicial officer "without unnecessary delay.[7] Title 18, section 3501(c) of the United States Code created an exception to Rule 5(a) and *McNabb-Mallory* by establishing a safeharbor for agents who obtain a

---

[6] Rule 5(a) provides in relevant part that "any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate judge . . . ."

[7] *See Mallory v. United States*, 354 U.S. 449, 1 L. Ed. 2d 1479, 77 S. Ct. 1356 (1957); *McNabb v. United States*, 318 U.S. 332, 87 L. Ed. 819, 63 S. Ct. 608 (1943); *see generally United States v. Superville*, 40 V.I. 457, 40 F. Supp. 2d 672, 679-87. (D.V.I. 1999) (distinguishing Rule 5(a) and *McNabb-Mallory* from the totality of the circumstances test for voluntariness and applying both separately).

confession within six hours of arrest.[8] *See Superville*, 40 F. Supp. 2d 672 at 683 ("[Section] 3501(c) only excised the first six hours after arrest or detention from the scope of the *McNabb-Mallory* exclusionary rule . . . . The first six hours of federal custody or detention, plus reasonable delay in travel to the presentation, can never constitute the "unnecessary delay" proscribed by Federal Rules of Criminal Procedure 5(a).").

■ Since Briscoe gave his statement within two hours of arrest, it falls squarely within section 3501(c)'s six-hour safeharbor, and outside the scope of Rule 5(a) and the *McNabb-Mallory* exclusionary rule. Accordingly, this Court will not suppress the defendant's voluntary statement.

## D. The Vienna Convention on Consular Relations

Briscoe asserts that the agents violated his rights under the Vienna Convention by not advising him of his right to contact the Jamaican consulate upon his arrest, and that the appropriate remedy for this violation is suppression of his statement. The government responds that the Vienna Convention did not create a personal right, and that even if it did, Briscoe has not shown prejudice, and suppression is not the proper remedy. The parties agree that federal law enforcement officers first contacted the Jamaican consulate more than three weeks after Briscoe's arrest, and that they never told him he had a right to contact his consul.

The United States and Jamaica have signed the Vienna Convention. Article 36 of the Convention grants a foreign national like Briscoe the *right to* contact his consul upon his detention "without

---

[8]Section 3501(c) in relevant part reads:

> In any criminal prosecution by the United States . . . a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States . . . if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention.

18 U.S.C. § 3501(c).

delay" and requires that authorities inform him "without delay" of this right:

> If [the detained alien] so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this subparagraph.

Vienna Convention, Apr. 24, 1963, art. 36, P 1(b), 21 U.S.T. 77, 596 U.N.T.S. 261. Before reaching the merits of Briscoe's claim, the Court will revisit the threshold question of the defendant's legal standing to raise this issue, which was recently addressed in *Superville*, 40 F. Supp. 2d at 676-78.

1. *The Defendant Has Standing to Raise the Violation of His Vienna Convention Rights.*

The government argues that Briscoe lacks standing to raise this question, because the Vienna Convention only creates rights enforceable by signatory nations. This Court has already found, however, that a foreign national has a personal right to consular notification. *Superville*, 40 F. Supp. 2d at 678. Moreover, since *Superville*, courts have unanimously held that the Vienna Convention created a personal right to consular notification.[9] Other courts recently addressing claims under the Vienna Convention have

---

[9] *See, e.g., United States v. Oropeza-Flores*, 1999 U.S. App. LEXIS 5991, No. 98-50305, 1999 WL 195621, at *2 (9th Cir. Mar. 31, 1999) (holding that foreign nationals have notification rights under Article 36 of the Vienna Convention and that those individuals have standing to enforce their rights in United States courts); *Lombera-Camorlinga*, 170 F.3d 1241 at 1243 (9th Cir. 1999) (same); *United States v. Torre-Del Muro*, 58 F. Supp. 2d 931, 1999 WL 515999, at *1 (C.D. Ill. 1999) (same); *United States v. Hongla-Yamche*, 55 F. Supp. 2d 74, 77-78 (D. Mass. 1999) (same) (citing *Superville*); *United States v. Alvarado-Torres*, 45 F. Supp. 2d 986, 988 (S.D. Cal. 1999) (same).

presumed that the defendant had standing.[10] Given the weight of opinion before and since *Superville*, this Court will not change its prior ruling that the Vienna Convention confers a private right of consular notification. Briscoe has standing to seek a remedy based on the violation of his consular notification rights.

The Court rejects the government's argument that Briscoe's claim to standing under the Vienna Convention is tantamount to "claiming that foreign nationals are entitled to greater rights in United States Courts than are guaranteed to United States citizens." (*See* Pl.'s Opp'n at 4.) The Vienna Convention merely attempts to even the playing field by requiring that foreign nationals have access to their consul. At most, this may put detained aliens on par with citizens of the detaining state, who likely possess greater familiarity and experience with their rights and the criminal process under the laws of their own country.[11]

In *Superville*, the Court did not rely solely on the view of the Department of State,[12] but also relied on the language of the treaty itself and the intent of the relevant agencies as expressed in their

---

[10] *See, e.g., United States v. Ademaj*, 170 F.3d 58, 66-68 (1st Cir. 1999) (considering claim of Convention violation without addressing standing issue); *United States v. Doe*, 1999 U.S. App. LEXIS 21400, No. 98-4844, 1999 WL 691842 (4th Cir. Sep 7, 1999) (same); *United States v. Kevin*, 1999 U.S. Dist. LEXIS 5728,. No. 97 CR. 763 JGK, 1999 WL 194749 (S.D.N.Y. Apr. 7, 1999) (same); *see also United States v. Salameh*, 54 F. Supp. 2d 236, 278 (S.D.N.Y. 1999) (refusing to reach standing issue).

[11] The United States Department of State recognizes the importance of such prompt notification. "In order for the consular officer to perform the protective function in an efficient and timely manner, it is essential that the consul obtain prompt notification whenever a U.S. citizen is arrested. Prompt notification is necessary to assure early access to the arrestee." U.S. DEP'T OF STATE, 7 FOREIGN AFFAIRS MANUAL § 411 (1984). The Manual further instructs all Foreign Service posts that "one of the basic functions of a consular officer has been to provide a 'cultural bridge' between the host community and the officer's own compatriots traveling or residing abroad. No one needs that cultural bridge more than the individual U.S. citizen who has been arrested in a foreign country or imprisoned in a foreign jail." *Id.* at § 401.

[12] The government submitted a copy of the Written Observations of the United States of America (Request for Advisory Opinion before the Inter-American Court of Human Rights) (Jun. 10, 1998) ["*Written Observations*"], and argues that this document represents the view of the United States Department of State that the Convention does not create a personal right. This Court will not rely upon a document submitted in opposition to Mexico's request for an advisory opinion as the controlling viewpoint of the Department of State. These Written Observations are not a statement of official policy, but a submission to a court in a quasi-adversarial proceeding, which the Department of State itself recognizes as a "particular bilateral situation."

regulations.[13] For example, the DOJ and INS require their agents to advise each alien detainee of her right to contact her consul. The INS specifically instructs its agents that "every detained alien shall be notified that he or she may communicate with the consular or diplomatic officers of the country of his or her nationality in the United States." *See* 8 C.F.R. § 236.1(e) (formerly codified at 8 C.F.R. § 242.2(g)); *see also United States v. Calderon-Medina*, 591 F.2d 529, 532 (9th Cir. 1979) (observing that the INS regulation "was evidently intended to ensure compliance with the Vienna Convention.") Similarly, the Department of Justice generally requires that "in every case in which a foreign national is arrested the arresting officer shall inform the foreign national that his consul will be advised of his arrest unless he does not wish such notification to be given." *See* 28 C.F.R. § 50.5(a)(1). Accordingly, the government's most recent submission in this case does not and cannot rebut the overwhelming weight of evidence and opinion that the Vienna Convention, as the "law of the land" in the United States, confers a private right actionable in this Court.

◼ No government representative ever told Briscoe that he had a right to contact his consulate. Further, the prosecution admits that no one contacted the Jamaican consulate until May 13, 1999, more than three weeks after the agents arrested him. The Court easily finds, therefore, that the United States violated Briscoe's Vienna Convention rights by failing to advise him of those rights "without delay" and by contacting his consulate more than three weeks after his arrest.

### 2. *The Defendant Did Not Show Prejudice*

Briscoe claims that he need not demonstrate prejudice to obtain a remedy for the violation of his Vienna Convention rights. He further claims that, even if prejudice is required, he has made the requisite showing. The defendant loses on both grounds. A defendant must prove prejudice, whether the violation was of the

---

[13] Even the government agrees that "courts generally defer to the view of the government agency charged with negotiating and enforcing the treaty." (Pl.'s Opp. at 5.) As noted in the text, the Immigration and Naturalization Service and the Department of Justice are charged with enforcing the treaty as agencies with the power to detain foreign nationals.

458

Vienna Convention itself, *see, e.g., Lombera-Camorlinga,* 170 F.3d 1241 at 1244 (defendant in a criminal proceeding has the initial burden of producing evidence showing prejudice from the violation of the Convention), or of INS or DOJ regulations, *see, e.g., Waldron v. INS,* 17 F.3d 511 (2d Cir. 1994) (alien must show prejudice to rights sought to be protected by relevant regulation to obtain relief for immigration judge's failure to comply with INS regulation if regulation does not affect fundamental Constitutional or statutory rights).

In the absence of a ruling by the Court of Appeals for the Third Circuit on the question, this Court adopts the definition of "prejudice" of the Ninth Circuit Court of Appeals in *United States v. Villa-Fabela,* 882 F.2d 434, 440 (9th Cir. 1989), overruled on other grounds by *United States v. Proa-Tovar,* 975 F.2d 592, 594-95 (9th Cir. 1992) (en banc). The defendant there had the burden of establishing prejudice by producing evidence that "1) he did not know of his right; 2) he would have availed himself of the right had he known of it; and 3) there was a likelihood that the contact [with the consul] would have resulted in assistance to him . . . ." *Id.* (internal quotation marks and citation omitted).

■ Applying these factors to Mr. Briscoe's case, the Court concludes that he has not shown that he suffered prejudice by the agents' failure to advise him of his right to contact his consul. Even giving him the benefit of the first two factors, he still was unable to demonstrate that there was a likelihood that the Jamaican consul would have helped him. At most, he suggests, he would have asked consular officials whether he should make a statement to the agents. Briscoe has made no showing what the consular official would have advised. More importantly, he has not explained how the help the consul might have given him would have added to or varied from the assistance that an attorney would have provided, which assistance he knowingly waived.

The same agents violated their agency regulations designed to enforce compliance with the Vienna Convention. *See* 8 C.F.R. § 236.1(e) and 28 C.F.R. § 50.5(a)(1). Briscoe argues that he does not need to show prejudice when an agency violates its own rules affecting individual rights. He relies on the *Accardi* doctrine, named after *United States* ex rel. *Accardi v. Shaughnessy,* 347 U.S.

260, 98 L. Ed. 681, 74 S. Ct. 499 (1954) (alien detainee need not show prejudice to receive a new hearing where Board of Immigration Appeals did not follow INS regulation). *Accardi* represents a specific application of the long-settled principle of federal administrative law that a federal agency must follow its own rules, at least where those rules and regulations have been promulgated to regulate the rights and interests of individuals.[14]

■ The Court declines Briscoe's invitation to extend to criminal prosecutions a doctrine developed for administrative proceedings. *See, e.g., Von Kahl v. Brennan*, 855 F. Supp. 1413, 1421 (M.D. Pa. 1994) ("To determine whether to apply this judicially evolved rule, a court must balance the relevant interests at stake in the context of the rights at issue and the proceedings under consideration."). Where an agency has violated its rules regarding its own administrative hearing, the impact of requiring a rehearing is minimal compared to the benefit of agency compliance with the law. Where the agency has violated its rules in a criminal proceeding, however, the sanction of excluding otherwise admissible evidence is extreme and can be warranted only where the defendant can show he suffered actual prejudice as a result of the regulatory violation.[15]

---

[14] *See Columbia Broad. Sys., Inc. v. United States*, 316 U.S. 407, 422, 86 L. Ed. 1563, 62 S. Ct. 1194, (1942) (agency regulations on which individuals are entitled to rely bind agency). This general administrative principle has been applied in many contexts, for example, in *Service v. Dulles*, 354 U.S. 363, 1 L. Ed. 2d 1403, 77 S. Ct. 1152 (1957) and *Vitarelli v. Seaton*, 359 U.S. 535, 3 L. Ed. 2d 1012, 79 S. Ct. 968 (1959), to vacate the discharges of government employees, and in *Yellin v. United States*, 374 U.S. 109, 10 L. Ed. 2d 778, 83 S. Ct. 1828 (1963), to overturn a criminal contempt conviction. The Courts of Appeals have recognized the principle. *See, e.g., Marshall v. Lansing*, 839 F.2d 933, 943 (3d Cir. 1988); *Smith v. Resor*, 406 F.2d 141, 145 (2d Cir. 1969); *United States v. Leahey*, 434 F.2d 7, 9-11 (1st Cir. 1970); *United States v. Heffner*, 420 F.2d 809, 812 (4th Cir. 1969); *Geiger v. Brown*, 136 U.S. App. D.C. 132, 419 F.2d 714, 718 (D.C. Cir. 1969); *Pacific Molasses Co. v. FTC*, 356 F.2d 386, 389-90 (5th Cir. 1966).

[15] Briscoe cites a decision from another jurisdiction to argue that prejudice should not be required. *Montilla v. INS*, 926 F.2d 162 (2nd Cir. 1991) (vacating deportation order and remanding because of agency's failure to strictly comply with regulations governing waiver of right to counsel). In *Montilla*, the court noted that "we have two options in applying these regulations in a case where there was a failure to fully comply with them: one is to insist that they be scrupulously adhered to; the other is to search the record to see if petitioner was prejudiced by the failure." *Id.* at 166. The Court referred to these options as the "*Accardi* doctrine" and the "prejudice" test, respectively. Ultimately, the *Montilla* court opted for the former, but it limited its applicability to administrative proceedings. *Id.* at 168 (the *Accardi* doctrine is a "judicially evolved rule ensuring fairness in administrative proceedings.") (emphasis added). Briscoe cites no

460

### 3. *The Court Need Not Consider Any Remedy Absent A Showing of Prejudice*

 Briscoe argued that the appropriate remedy for the agents' violation of the his Vienna Convention rights would be the suppression of his statement. Before the Court can even consider what remedy might be available and appropriate, Briscoe must demonstrate that the violation prejudiced him in defending this case.[16] Since the defendant has been unable to establish any legally sufficient prejudice, the Court has no occasion to consider the remedy.[17] Accordingly, even though the agents violated his Vienna Convention rights, the Court will not suppress Briscoe's statement.

## III. CONCLUSION

The agents read Wilbert Briscoe his *Miranda* rights, and he validly waived those rights. He then voluntarily gave a statement to the agents. That statement is not subject to exclusion for "unnecessary delay" under Rule 5(a) of the Federal Rules of Criminal Procedure, nor did any delay play a part in coercing that statement from the defendant. In addition, Mr. Briscoe failed to demonstrate that he suffered any prejudice by the agents' violation of his rights under Article 36 of the Vienna Convention on Consular Relations and related agency regulations. Wilbert

---

case extending the Accardi Doctrine beyond this qualification, and this Court will not do so.

[16] Courts that have reached the issue of whether suppression is a proper remedy in cases of violation of the Vienna Convention are split. *See, e.g., Lombera-Camorlinga,* 170 F.3d at 1244; *Oropeza-Flores,* 1999 WL 195621, at *2 (suppression is the proper remedy once prejudice is shown); *Torres-Del Muro,* 1999 WL 515999, at *3 (exclusionary rule is applied generally to deter the police from violating a person's Constitutional rights or where Congress has provided for exclusion in a statute); *Alvarado-Torres,* 45 F. Supp. 2d at 994 (exclusionary rule is only employed to protect fundamental Constitutional values).

[17] The Court reserves its authority to fashion a remedy should the need ever arise. As this Court noted in *Superville,* footnote 9, "where there is a legal right, there is also a legal remedy by suit or action at law whenever that right is invaded, Sir William Blackstone, 3 COMMENTARIES ON THE LAWS OF ENGLAND 23, *cited in Marbury v. Madison,* 5 U.S. 137, 163, 2 L. Ed. 60 (1803)." *See also Bell v. Hood,* 327 U.S. 678, 684, 90 L. Ed. 939, 66 S. Ct. 773 (1946) ("[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.") (*citing Marbury*); *McNabb,* 318 U.S. at 340 ("Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence.").

Briscoe's motion to suppress his statement will be denied. An appropriate order follows.

## ORDER

For the reasons set forth in the accompanying memorandum of even date, it is hereby

ORDERED that the defendant's motion for suppression of statements is DENIED.

ENTERED this 15th day of October, 1999.